**Charles O'NEAL and Leo O'Neal,
Appellants,**

v.

**CHEYENNE RIVER SIOUX TRIBE et al.,
Appellees.**

**No. 73–1031.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1973.

Decided July 24, 1973.

Rehearing Denied Aug. 20, 1973.

David L. Bergren, Fort Pierre, S. D., for appellants.

William J. Janklow, Pierre, S. D., for appellees.

Before MATTHES, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and ROSS, Circuit Judge.

ROSS, Circuit Judge.

The principal issue on this appeal is whether individual Indian plaintiffs, who fail to exhaust tribal remedies in

civil disputes with the tribe, are prohibited from bringing suit in federal court on an action predicated essentially upon the Indian Bill of Rights. 25 U.S.C. § 1302. In this case the trial court held that such Indian plaintiffs must first exhaust their tribal remedies and dismissed the action. We affirm with modifications.

The plaintiffs are enrolled members of the Cheyenne River Sioux Tribe (hereafter CRST). They operate a ranch on the CRST reservation, and graze cattle on a "grazing unit" which is owned by the CRST, but leased to the plaintiffs.

In 1966 the plaintiffs borrowed $28,000.00 from the Farmers Home Administration and also borrowed some $8,221.96 from the CRST to purchase 80 calves. In 1967, the plaintiffs secured a $13,000.00 loan from the bank, which was guaranteed by the CRST. By 1970 the plaintiffs had paid off some $24,000.00 of the FHA loan. The plaintiffs claim they were encouraged to "pay the FHA in advance and let the Tribe go". The encouragement purportedly came from the Tribal Rehabilitation Committee and its manager.

On January 27, 1970, the plaintiffs were notified by letter that the Tribal Rehabilitation Committee had ordered foreclosure of "the loan." The letter indicated that if the plaintiffs requested a hearing, the manager of the Committee was to be notified the next day. It appears that the plaintiffs did so, as there was a meeting between the Committee and the plaintiffs the next day. On January 29, 1970, the plaintiffs were served with a tribal court order, obtained ex parte, signed by a judge of the "Junior Court of the Cheyenne River Sioux Tribe." The order authorized the Committee to take possession of cattle, a gas tank, and a tractor which evidently secured "the loan." The order stated, in part:

"You are further ordered that within three (3) days from the date this order is served on you, unless you have made an appearance in this Court and an extension granted to have gathered all livestock, equipment and other items covered by this order at your ranch headquarters . . . ."

Although the order appeared to give the plaintiffs three days to seek an extension of time in the Junior Court, the next day, January 30, 1970, more than 100 head of cattle were taken from the plaintiffs' land. On February 26, 1970, the plaintiffs "received an accounting which [they] cannot understand . . . ."

Sometime between January 24 and 30, with knowledge of the foreclosure order, the plaintiffs purchased 250 head of cattle. Sometime between January 24 and March 2 the plaintiffs orally learned that their grazing unit was being offered for lease. Although they made reapplication for the unit, they were told that they did not own 50% of the cattle grazing on the unit and hence were not entitled to lease the grazing unit. A CRST resolution provided that "[I]ndian operators must prove ownership of enough livestock to equal 50% of the carrying capacity of the range unit." On March 2, 1970, the plaintiffs were notified that the grazing unit permit was revoked, and that the plaintiffs had 30 days to move from the grazing unit.

On April 10, 1970, this action was filed. The complaint was based upon 25 U.S.C. § 1302 (Constitutional Rights of Indians), 28 U.S.C. § 1346 (the United States as a defendant), the respective Constitutions of the United States and South Dakota, and the Law and Order Code of the CRST, against the present Indian defendants, together with the United States and some of its officers.

The substance of the complaint was that some of the defendants had wrongfully taken the above-mentioned cattle, and wrongfully threatened eviction from the grazing unit. The plaintiffs prayed for the following relief:

1. For an immediate Temporary Restraining Order restraining the Defendants from taking any further ac-

tion concerning the attempted foreclosure of Plaintiffs' loans and attempted revocation of Plaintiffs' grazing permit and impending eviction from the grazing unit pending a determination of the rights of the parties to this action.

2. That this Court adjudge and declare the rights and other legal relations of the parties herein, and order that such declaration shall have the force and effect of a final judgment.

3. That the Court award to the Plaintiffs $50,000.00 actual and $1,000,000.00 punitive damages, and costs and allowances herein.

4. That the Court declare that the repossession of Plaintiffs' cattle was illegal, null and void and that all cattle taken and subsequently converted be returned to the Plaintiffs or their equivalent.

5. That the Court grant such additional relief as may appear to the Court to be equitable.

On May 25, 1970, a restraining order was granted prohibiting the cancellation of the grazing permit. Upon stipulation of counsel the non-Indian defendants were dismissed from the suit since none of these government defendants performed a discretionary function with regard to the grazing permit. On October 3, 1972, after plaintiffs had presented their case, the action was dismissed without prejudice, for failure to exhaust tribal remedies. The basis for this action was:

"Obviously, he never went to the Superior Court, where he had a right to go. Under Title 4 of the Law and Order Code, Subchapter 3, and Section 9(a), the Superior Court of the Cheyenne River Sioux Tribe has original jurisdiction over all civil actions in which the defendant is an Indian and is found within the territorial jurisdiction and including civil remedies.

.   .   .   .   .   .

"Now, it seems to me that there was a clear failure on the part of the plaintiff to exhaust his remedies, the

main remedies being application by the plaintiff to seek redress in the Tribal Court, especially the Superior Court."

■ In order to determine whether the district court properly dismissed the action, this Court is required to answer three questions: (1) What, if any, tribal remedies existed? (2) Should an exhaustion requirement generally be applied in cases such as this? (3) If exhaustion is generally required, is it appropriate to require exhaustion in this case?

An analysis of the Law and Order Code of the CRST (hereinafter Code) leads us to the conclusion that two distinct tribal remedies existed which the plaintiffs concededly did not exhaust.

First, the repossession order, which supplied the legal authority to repossess the cattle in this case, was issued by a judge of the Junior Court of the CRST. It appears that such an order would have been appealable: The Code, in Title 4, Chap. 1, Subchapter 5, § 49, provides:

"*Notice of Appeals*: Every person aggrieved by any final judgment or other final order of the Junior or Superior Court of the Cheyenne River Sioux Tribal Court except in those criminal cases where no right to appeal exists, must, either at the time of the rendering of judgment or within 5 days after such judgment or order was rendered give notice of appeal or demand a trial by jury."

The Code, in Title 4, Chap. 1, Subchapter 4, § 13, further provides:

"*Jurisdiction—Writs or Orders*: The Appellate Court shall have power to issue any writs or orders necessary and proper to the complete exercise of its jurisdiction, or to prevent or remedy any act of the Junior or Superior Court beyond such court's jurisdiction, or to cause the Junior or Superior Court to act where they unlawfully fail or refuse to act within their jurisdiction."

This last provision is significant because the plaintiffs contended that the Junior Court of the CRST lacked civil jurisdiction as it was primarily a criminal court. This section clearly indicates that the appellate court had jurisdiction to issue a writ to prohibit the Junior Court from acting outside of its jurisdiction.

Second, the plaintiffs could have instituted a separate suit and the Superior Court would have had jurisdiction over most of the original defendants in this action. The Code, in Title 4, Chap. 1, Subchapter 3, §§ 9(A) and 10, provides:

> *"Jurisdiction—Generally:* The Superior Court of the Cheyenne River Sioux Tribe shall have original jurisdiction over:
>
> *"Civil Causes of Action:* All civil actions in which the defendant is an Indian and is found within its territorial jurisdiction; and including civil remedies.
>
> .   .   .   .   .   .
>
> *"Jurisdiction—Territorial:* The territorial jurisdiction of the Superior Court of the Cheyenne River Sioux Tribe shall embrace all land within the exterior boundaries of the Cheyenne River Sioux Indian Reservation .  .  .  ."

Furthermore, the Code, in Title 4, Chap. 1, Subchapter 3, § 11, provides that "[T]he Superior Court shall have power to issue any writs or orders necessary and proper to its jurisdiction."

■ This review of the Code clearly indicates that there were two types of tribal remedies which were open to the plaintiffs. It is, therefore, incumbent on this Court to determine whether, as a general rule, exhaustion should be required.

This action, essentially predicated on allegations of due process violations, was primarily based upon 25 U.S.C. § 1302.

25 U.S.C. § 1302 provides in pertinent part:

> "No Indian tribe in exercising powers of self-government shall—
>
> .   .   .   .   .   .
>
> (5) take any private property for a public use without just compensation;
>
> .   .   .   .   .   .
>
> (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;"

Enacted in 1968, this significant legislation was designed to remedy the anomalous situation in which reservation Indians found themselves. As Senator Ervin, the moving force behind the legislation, said:

> " 'The reservation Indian now has no Constitutional rights. The purpose of the amendment is to give these Indians constitutional rights which other Americans enjoy.' " White Eagle v. One Feather, 478 F.2d 1311 (8th Cir. 1973).

It is the plaintiffs' position in this lawsuit that Congress did not intend to require exhaustion of tribal remedies, because the purpose of the legislation was to give Indians the "constitutional rights which other Americans enjoy." Since other Americans, according to the plaintiffs, need not exhaust state remedies when bringing conventional civil rights suits, *see e. g.,* Stradley v. Andersen, 456 F.2d 1063 (8th Cir. 1972), the plaintiffs argue that they should not be required to exhaust tribal remedies. However, it is clear to us that Congress wished to protect and preserve individual rights of the Indian peoples, with the realization that this goal is best achieved by maintaining the unique Indian culture and necessarily strengthening tribal governments.[1] From this

---

1. Congress clearly did not intend to detract from the continued vitality of the tribal courts by passage of this legislation. For example, 25 U.S.C. § 1311 authorizes the creation of a Model Code Governing Courts of Indian Offenses. Furthermore, 25 U.S.C. §§ 1321–1322 require tribal consent before a State may assume civil or

perspective an exhaustion requirement is consistent with the statute.

Prior to the adoption of the Indian Bill of Rights, the courts respected the need of Indians to maintain strong tribal governments. In 1959 the Supreme Court was faced with a suit by a non-Indian general store operator, who conducted his business on an Indian reservation, against an Indian couple. The non-Indian obtained a judgment in state court. The Supreme Court reversed on the basis that the state court lacked jurisdiction to determine the matter. The Court noted that it would not:

> "undermine the authority of the tribal courts over Reservation affairs . . . [which] would infringe on the right of the Indians to govern themselves. . . . The cases in this Court have consistently guarded the authority of Indian governments over their reservations. . . ." Williams v. Lee, 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959).

Since the passage of the Indian Bill of Rights we have recognized the fear that the courts may " 'apply broadly such elusive and expanding concepts as due process . . . without sensitive regard for their impact on tribal structures and values.' " White Eagle v. One Feather, *supra*, 478 F.2d 1311. In addition, Congress was sensitive to the possibility of disrupting the Indian governments when it passed the Indian Bill of Rights:

> "Discussion of the Indian Bill of Rights showed no intent to use the statute as an instrument for modifying tribal cultural attitudes in order to facilitate assimilation of Indians into the non-Indian community. In fact, the committee showed a positive intent to avoid requirements injurious to the tribes' capacity to function as autonomous governmental units." Comment, The Indian Bill of Rights and The Constitutional Status of

Tribal Governments, 82 Harv.L.Rev. 1358, 1359 (1969).

This Court has held that the rights engendered by the adoption of the Indian Bill of Rights may be enforced by appropriate federal jurisdictional statute. Luxon v. Rosebud Sioux Tribe of South Dakota, 455 F.2d 698 (8th Cir. 1972). In holding that 28 U.S.C. § 1343(4) gives a district court jurisdiction to determine whether an Indian tribe has denied to one of its members any of the rights given by the Indian Bill of Rights, we carefully noted that the plaintiff had exhausted all "administrative" remedies. *Id.* at 699.

Cited in the *Luxon* case, *Id.* at 700, was the decision in Dodge v. Nakai, 298 F.Supp. 17, 25 (D.Ariz.1968). In *Dodge* the court recognized that:

> "The question arises whether an implied condition to invocation of Title II in this Court is a demonstration that plaintiffs have exhausted remedies available to them within the existing tribal government framework." *Id.*

The court stated:

> "Several factors support the implication of such a condition into Title II. First, this interpretation would reconcile the statute with a 'strong Congressional policy to vest Navajo Tribal Government with responsibility for their own affairs.' . . . Second, this interpretation would place primary responsibility for the vindication of rights violated by Indian governmental agencies upon the tribal courts. Such responsibility may well enhance the development of an independent Indian judiciary, thus reconciling the statute with recognized federal policy. . . . Third, this interpretation would insure that this Court would intervene only in those instances in which local conflicts cannot be resolved locally. . . ." *Id.*

criminal jurisdiction. These sections were passed contemporaneously with the

section enumerating the constitutional rights of Indians. 25 U.S.C. § 1302.

The court went on to hold, however, that exhaustion was not required because, due to the presence of defendants not amenable to tribal court jurisdiction, such a requirement would result in a multiplicity of lawsuits and a delay of remedy.

In McCurdy v. Steele, 353 F.Supp. 629 (D.Utah 1973), the plaintiffs sought official recognition as the governing business council of the Confederated Tribes of the Goshute Reservation. Faced with an argument that the plaintiffs should be required to exhaust, the court noted that such a requirement "finds support in the apparent congressional intention, reflected in the statute, to preserve the integrity of tribal governmental structure." *Id.* at 636. However, since the Goshute apparently had no court having civil jurisdiction, such matters being decided by tribal council, and the tribal council which would decide the matter was the same tribal council challenged by the plaintiffs, exhaustion was held inappropriate.

■ We conclude that the adoption of the Indian Bill of Rights was not meant to detract from the generally recognized policy, stated in the *Williams* case, of preserving the "authority of the tribal courts . . . ." Williams v. Lee, *supra,* 358 U.S. at 223, 79 S.Ct. 269. Furthermore, we believe that the policy stated in *Williams* "would support an exhaustion requirement." Comment, The Indian Bill of Rights and the Constitutional Status of Tribal Governments, 82 Harv.L.Rev. 1358, 1373 & n. 124 (1969). While it is apparent from a reading of *Dodge* and *McCurdy* that an exhaustion requirement has generally been recognized,[2] both of these cases, however, have indicated that exhaustion is not an inflexible requirement. A bal-

ancing process is evident; that is weighing the need to preserve the cultural identity of the tribe by strengthening the authority of the tribal courts, against the need to immediately adjudicate alleged deprivations of individual rights. Thus this Court must determine whether exhaustion is appropriate in the case at bar.

The plaintiffs assert essentially five grounds upon which they base their argument that exhaustion is not appropriate: (1) not all of the parties are amenable to tribal court jurisdiction, (2) the tribe has sovereign immunity, (3) the tribal courts lack injunctive powers, (4) the tribal courts are controlled by the CRST governing committee, (5) the CRST Code effectively prevents assistance of counsel.

■ First, the plaintiffs argue that since the United States and various non-Indians were once defendants, exhaustion, under the rationale of Dodge v. Nakai, *supra,* 298 F.Supp. 17, is inappropriate. This contention can be summarily disposed of due to the fact that these defendants were dismissed by stipulation, apparently because these defendants performed no discretionary functions and hence were not proper defendants in the first place. The plaintiffs are thus bound by their stipulation.

■ Second, while the plaintiffs are correct that the CRST is clothed with sovereign immunity,[3] this provision obviously would not have prevented an appeal from the repossession order of the Junior Court of CRST. Moreover, it would not be an undue burden to require the plaintiffs to seek consent from the tribe in the event the plaintiffs are required to maintain a separate action in the Superior Court of the CRST.

---

2. *See also* Seneca Constitutional Rights Organization v. George, 348 F.Supp. 51, 58 (W.D.N.Y.1972): "[C]ertainly no jurisdiction exists unless a claim is supported by well pleaded facts including facts which show that resort to tribal remedies has failed."

3. The Code, in Title 4, Chap. 2, Subchapter 1, § 21, provides: "*Tribe Immune from Suit:* The Court shall have no jurisdiction over any suit brought against the Tribe *without consent of the Tribe.* Nothing in this Code shall be construed as consent by the Tribe to be sued." (Emphasis supplied).

Third, we do not read the Code in the same way plaintiffs do with respect to the injunctive powers of CRST courts. As previously noted, it is clear that had an appeal been taken from the order of the Junior Court, the appellate court had the power to issue "any writs or orders . . . to prevent or remedy any act of the Junior . . . Court beyond such court's jurisdiction. . . . ." Code, Title 4, Chap. 1, Subchapter 4, § 13. The Superior Court has jurisdiction over all civil actions "including civil remedies." Code, Title 4, Chap. 1, Subchapter 3, § 9[A]. Moreover, the Superior Court has jurisdiction to "issue any writs or orders necessary and proper to its jurisdiction." Code, Title 4, Chap. 1, Subchapter 4, § 11. We are convinced that should an action be brought in the Superior Court, the court has the power to grant injunctive relief.

Fourth, we do not believe that the judicial system of the CRST has been demonstrated to be lacking in integrity. The only factual basis for such an assertion is testimony by a Junior Court judge that he consulted with a Superior Court judge relative to the jurisdictional powers of the Junior Court when deciding whether to grant the repossession order. The Superior Court judge, now deceased, evidently informed the Junior Court judge that the matter pending before the Junior Court was merely "administrative" and thus the Junior Court had jurisdiction. Regardless of the correctness of this advice, it does not demonstrate any illicit control of the judicial system by the CRST's executive or legislative branches of government. Without a factual basis for the claim that the CRST judicial system is nothing more than a subservient branch of the executive or legislative branches of the CRST, we must indulge in a presumption that the judges of the CRST courts act independently.

The final argument rests upon the fact that professional attorneys must pay a license fee of $300.00 before admittance to practice before the courts of the CRST. Code, Title 4, Chap. 2, Subchapter 7, § 54[C]. Upon this fact the plaintiffs rest their argument that exhaustion is inappropriate because they would be denied assistance of counsel. We reject this argument for a number of reasons. There has been no showing that the plaintiffs are unable to turn to attorneys who are admitted to practice before the CRST courts and we do not know whether or not plaintiffs' attorney herein is admitted to practice before the courts of the CRST. Finally the plaintiffs note that the fee has been waived for the CRST's professional attorney, but the plaintiffs do not indicate whether such a waiver has been or could be sought for their own attorney. Put simply, the relatively high license fee by itself does not mandate the conclusion that the plaintiffs will be denied assistance of counsel should they be required to return to the CRST courts.

Although not raised by either party, we note that an action maintained in the Superior Court at this time in an attempt to exhaust tribal remedies, might be barred by a Statute of Limitations contained in the Code. The Code, in Title 4, Chap. 2, Subchapter 1, § 20, provides:

> "*Limitation of Actions for Debts or Damages:* The Court shall have no jurisdiction over any action for debt or damages brought more than three years after the cause of action arose."

The cause of action apparently arose in this case sometime between January 27, 1970, and March 2, 1970. The federal suit was commenced on April 20, 1970. At the time of filing this opinion the Statute of Limitations apparently will have run *unless* the commencement of the action in federal court tolled the CRST Statute of Limitations.

We think the plaintiffs have a strong equitable argument that the federal action did toll the CRST Statute of Limitations. As the Supreme Court has said:

> "Statutes of limitations are primarily designed to assure fairness to defend-

ants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. . . . '

. . . . . .

This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights." Burnett v. New York Central R.R., 380 U.S. 424, 428, 85 S.Ct. 1050, 1055, 13 L.Ed.2d 941 (1965). *Cf.* Mizell v. North Broward Hospital District, 427 F.2d 468, 473–474 (5th Cir. 1970).

The defendants are in no position to claim that the plaintiffs have allowed their claims to "slumber"; indeed, it would seem anomalous for the defendants to plead the bar of the Statute of Limitations in the Superior Court when the defendants have faulted the plaintiffs for not returning to the Superior Court. In any event, this is a matter that should be decided in the first instance by the tribal court.

In sum, we can find no persuasive reasons for not requiring exhaustion in this case. A general exhaustion requirement in cases such as this will do much to strengthen tribal governments, including tribal courts, and, thereby aid the reservation Indian in maintaining a distinct cultural identity. However, each case will require a balancing of the merits of exhaustion against the harm an exhaustion requirement might threaten with regard to those who claim their constitutional rights have been violated.

■ In this case the plaintiffs have completed their proof at considerable expense and after three days of trial. They no longer have the right to appeal from the Junior Court's order since the period within which to give notice of appeal has expired. The plaintiffs may however turn to the Superior Court in an original action against the Tribe *if* the CRST consents to suit and the Statute of Limitations has not run. Under these circumstances the trial court should enter an order withdrawing its order of dismissal of October 3, 1972, and substitute an order requiring the plaintiffs to institute suit in the Superior Court within a reasonable amount of time. If the plaintiffs fail to do so within a reasonable amount of time the order of dismissal shall be reinstated. If the plaintiffs institute suit in the Superior Court, and the Superior Court does not reach the merits of the controversy because it is barred by the Statute of Limitations, or, the CRST, after a request from the plaintiffs, refuses consent to be sued, the district court shall proceed with the trial and decide the case on its merits without reference to any further necessity of exhausting tribal remedies. If it becomes clear that the Superior Court will reach the merits of the controversy, the district court shall enter the order of dismissal, without prejudice.

For the reasons hereinbefore expressed, the decision appealed from is affirmed as modified.