Duniway, Circuit Judge, dissented and filed opinion.

**UNITED STATES of America ex rel. Henry F. COBELL, Petitioner-Appellee,**

v.

**Joan R. COBELL et al., Respondents,**

and

**Leona Conway, Respondent-Appellant.**

**UNITED STATES of America ex rel. Henry F. COBELL, Petitioner-Appellee,**

v.

**Joan R. COBELL et al., Respondents,**

and

**The Honorable Judge John Sharp and the Blackfeet Tribal Court, Respondents-Appellants.**

**Nos. 72–3175, 73–1071.**

United States Court of Appeals, Ninth Circuit.

Sept. 5, 1974.

Donald R. Marble (argued) of Bunn & Marble, Chester, Mont., for appellants in 72–3175.

John T. McDermott (argued), Director, Indian Law Program, University of Montana, School of Law, Missoula, Mont., for appellants in 73–1071.

D. Patrick McKittrick (argued), Great Falls, Mont., for appellee.

Before DUNIWAY and TRASK, Circuit Judges, and SHARP,* District Judge.

## OPINION

TRASK, Circuit Judge:

This is a unique child custody struggle involving the conflicting jurisdictional claims of the Montana state courts and the Blackfeet Tribal Court. The controversy comes before us on appeal from the granting of a writ of habeas corpus by the federal district court pursuant to 25 U.S.C. § 1303.[1]

Henry and Joan Cobell, the parents of the two minor children who are the subjects of this custody battle, are both enrolled members of the Blackfeet Tribe. In August 1971, Joan Cobell sued for a divorce in the Montana state court and Henry Cobell counterclaimed. A divorce decree was entered the following December and Henry Cobell was granted tem-

---

* Honorable Morell E. Sharp, United States District Judge from the Western District of Washington, sitting by designation.

1. Section 1303 reads:

"The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."

porary custody of the children. In August 1972, however, the state court modified its original order and transferred custody of the children to their mother, pending further hearings. Acting under the authority of this revised order, Joan Cobell took the children to her mother's home on the Blackfeet Reservation. Meanwhile, Henry Cobell successfully appealed the custody reversal to the Montana Supreme Court. The August 1972 order granting custody to Joan Cobell was vacated and temporary custody was restored to Henry. The mother, however, refused to surrender the children, and it is at this point that the Blackfeet Tribal Court intervened. On a petition from the children's maternal grandmother (appellant Leona Conway),

Tribal Judge John Sharp assumed jurisdiction over the controversy and issued, *ex parte*, a temporary restraining order enjoining the children's removal from the Blackfeet Reservation.[2] Service of the order was effected on Henry Cobell by mail. Shortly thereafter, Henry Cobell filed a petition for a writ of habeas corpus in the federal district court in order to secure the release of his two children. The District Court granted the writ and ordered that the custody of the children be restored to the father in accordance with the Montana state court rulings. The children's grandmother, Leona Conway, and Tribal Judge John Sharp both appeal the granting of this writ.[3]

2. The full text of Judge Sharp's order reads:
"Upon the filing of a Petition by Leona Conway and good cause having been shown;
"NOW THEREFORE, it is ordered as follows:

I.
"That Venetta Lynn Cobell and Rodney Dale Cobell are hereby declared to be without sufficient and adequate supervision; and,

II.
"That said children are presently residing on the Blackfeet Reservation and are Indian offspring, of parents who are enrolled members of the Blackfeet Tribe and legal residents; and,

III.
"That said children are suffering emotionally and psychologically because of the uncertainty of their custody and adult supervision; and,

IV.
"That the Court as a friend and protector of these children deems it necessary under the circumstances to assume the care, custody and control of the children, by virtue of its jurisdiction, until a hearing may be held after investigation by the Welfare Department; and,

V.
"That said children be, and they are hereby ordered to be under the care, custody and control of this Court; and,

VI.
"That the children are not to be removed from the Blackfeet Reservation by anyone without further order of this Court; and,

VII.
"That a copy of this order be served personally or through the mail upon the parents, Henry Cobell and Joan Cobell; and,

VIII.
"That the Welfare Department is ordered to provide for these children until further order of this Court, and to make periodic reports to this Court that it may request;; [sic] and;

IX.
"That this Order will be temporary until this Court is satisfied that Montana State District Court has made a final determination upon the question of custody and until this Court is further satisfied that custody provisions are accepted and for the best interests of said children.
DATED this 6th day of October, 1972."
C.T. at 4–5.

3. On January 3, 1973, Judge Sharp issued an "Order to Vacate," as follows:
"Action and compliance [sic] with the December 15, 1972, Order of the United States District Court for the District of Montana and the January 3, 1973, Order of the United States Court of Appeals for the Ninth Circuit.
"IT IS ORDERED that the temporary restraining order of October 6, 1972, is hereby vacated;
"IT IS FURTHER ORDERED that the custody of the two (2) children, Venetta Lynn Cobell and Rodney Dale Cobell, is hereby awarded to their father, Henry Cobell;
"IT IS FURTHER ORDERED that Joan Cobell release the children to Henry Cobell at his request.
"Dated this 3rd day of January, 1973.
/s/ John P. Sharp
JOHN P. SHARP, Chief Judge
for the Blackfeet Tribe."
Brief for Appellants at Appendix A.

Preliminarily, we address the appellants' argument that the habeas corpus petition was prematurely entertained since the petitioner had not "exhausted" his tribal remedies. That is, it is urged that a principle analogous to the "exhaustion of state remedies" doctrine be applied to federal review of tribal actions. Here it is argued that Henry Cobell could have requested a hearing before Judge Sharp or could have appealed the tribal restraining order to a special tribal appellate court before he sought federal intervention.

Unlike the general habeas corpus statute directed against unlawful state custody 28 U.S.C. § 2254, there is no express exhaustion requirement contained in the specialized writ which is involved in this controversy, 25 U.S.C. § 1303.[4] Nonetheless, we acknowledge the principle of comity which underlies the exhaustion doctrine, Preiser v. Rodriguez, 411 U.S. 475, 490, 93 S.Ct. 1827, 36 L. Ed.2d 439 (1973), and note that the doctrine has been applied in other non-state contexts, e. g., Gusik v. Schilder, 340 U. S. 128, 131–132, 71 S.Ct. 149, 95 L.Ed. 146 (1952) (habeas attack on military judgment). The arguments in favor of extending the exhaustion doctrine to reviews of tribal action under the Indian Bill of Rights, 25 U.S.C. §§ 1301–1303, are well summarized in Dodge v. Nakai, 298 F.Supp. 17, 25 (D.Ariz.1968):

> "First, this interpretation [reading an exhaustion requirement into the act] would reconcile the statute with 'a strong Congressional policy to vest Navajo Tribal Government with responsibility for their own affairs.' . . . Second, this interpretation would place primary responsibility for the vindication of rights violated by Indian governmental agencies upon the tribal courts. Such responsibility may well enhance the development of an independent Indian judiciary, thus reconciling the statute with recognized federal policy . . . . Third, this interpretation would insure that this

Court would intervene only in those instances in which local conflicts cannot be resolved locally . . . ."

The reasoning in Dodge v. Nakai has also been recently approved by the Eighth Circuit. In O'Neal v. Cheyenne River Sioux Tribe, 482 F.2d 1140, 1146 (8th Cir. 1973), the court concluded:

> ". . . [T]he adoption of the Indian Bill of Rights was not meant to detract from the generally recognized policy, stated in the *Williams* case, of preserving the 'authority of tribal courts . . . .' Williams v. Lee, *supra*, 358 U.S. [217] at 223, 79 S.Ct. 269, [3 L.Ed.2d 251]. Furthermore, we believe that the policy stated in *Williams* 'would support an exhaustion requirement.'"

*See also* McCurdy v. Steele, 353 F.Supp. 629 (D.Utah 1973).

▮▮▮ Our recognition of the exhaustion principle in the tribal context is not unqualified, however. We concur with the view expressed by the Eighth Circuit that "exhaustion is not an inflexible requirement." O'Neal v. Cheyenne River Sioux Tribe, *supra* 482 F.2d at 1146. The court there further observed:

> "A balancing process is evident; that is weighing the need to preserve the cultural identity of the tribe by strengthening the authority of the tribal courts, against the need to immediately adjudicate alleged deprivations of individual rights. Thus this Court must determine whether exhaustion is appropriate in the case at bar." *Id.* at 1146.

Indeed, exhaustion was ultimately found to be impractical in Dodge v. Nakai, *supra*, and McCurdy v. Steele, *supra*, cases which endorsed the exhaustion principle in general. Likewise, we do not believe that the District Court here erred when it concluded that Henry Cobell lacked meaningful remedy in the tribal courts. First, the restraining order issued by Judge Sharp contained no invitation to

4. See n. 1, *supra*.

participate in tribal appellate processes. Rather, the *ex parte* order, although designated as "temporary," spoke with a tone of finality. More significantly, however, is the fact that Judge Sharp testified that he had issued the restraining order to test tribal jurisdiction, and that only a federal court order would cause him to rescind the action. Under these circumstances, we agree with the District Court's conclusion that:

". . . [T]he petitioner had no effective remedies available to him in Tribal Court. . . . That remedies are available in theory, but not in fact, is not synonymous with failure to exhaust remedies. That ineffective and meaningless procedures were available to petitioner does not preclude his seeking a writ of habeas corpus." C.T. at 101–102.

At the outset we are confronted with the question of mootness although not urged by any of the interested parties. Following the action of Judge Sharp which vacated the Tribal Court's restraining order and ordered Joan Cobell to release the children to Henry Cobell at his request, the children were obtained by Henry who returned with them to Billings, Montana. The parents were then involved in active litigation before Montana state courts concerning custody. Thus the order of the District Court has been fully performed.

However, the determination of the issue by the District Court and compliance therewith by the interested parties does not necessarily render the cause moot. The underlying conflict still exists. Notice of appeal was filed both by Leona Conway and by the Blackfeet Tribal Court and the Honorable John Sharp, Judge. The District Court noted that it had been informed that an appeal would be taken when his final order was made. The loser in the custody battle in the Montana state courts may still return to the reservation as a sanctuary in the hope that Judge Sharp or his successor might upon reconsideration choose not to follow the existing District Court ruling. Indeed, the brief on behalf of

Judge Sharp and the Tribe, in its opposition to any suggestion of mootness, frankly states that "[i]t is much more than merely possible that the childless parent will continue to use the judicial processes available to obtain custody—it is almost a certainty!"

It is clear that the voluntary cessation of the conduct which has been challenged does not necessarily render the case moot. United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); So. Pacific Terminal Co. v. I. C. C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Alton & So. Ry. Co. v. Int'l Ass'n of Mach. & A. W., 150 U.S.App.D.C. 36, 463 F.2d 872 (1972); Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1682 (1970). Here the situation itself, plus the implications of the appellants' briefs, suggests the tinder which can not only inflame the same controversy but bring the same parties before the court again. In addition, there is a public interest in having the issue now before the court resolved with some hope of finality. It affects the most sensitive of human relationships; it also directly involves the vital jurisdictional harmony of two sovereign entities. The case has not become moot either as a matter of judicial administration or of constitutional dimension under article III.

We therefore turn to the primary jurisdictional issue involved in this appeal. The State of Montana's interest in the welfare of the Cobell children is beyond dispute. The children were domiciled in the state and enrolled in the state public school system when Joan and Henry Cobell began their divorce proceedings. Presence, domicile and jurisdiction over the parents are well recognized bases for the assertion of jurisdiction to determine child custody. Restatement (Second) Conflict of Laws § 79 (1971). Even more pertinent is Mont.Rev.Stat. Tit. 21, § 138 (1947) which states:

"In an action for divorce the court or judge may, before or after judgment,

give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper, and may at any time vacate or modify the same."

Thus, by *voluntarily* invoking the state court's jurisdiction for divorce purposes, the Cobells clearly submitted the question of their children's custody to the judgment of the Montana state courts. Moreover, Montana, like the majority of states, views its jurisdiction in custody matters as continuing, Barbour v. Barbour, 134 Mont. 317, 330 P.2d 1093 (1958), and unaffected by the removal of the children from the state, Butts v. Collins, 129 Mont. 440, 289 P.2d 949 (1955).

 Notwithstanding the jurisdictional claims of the Montana courts, the appellants argue that the presence of the children on the Blackfeet Reservation gave the Tribal Court a coequal interest in the children's welfare. Although the possibility that two sovereigns may enjoy concurrent jurisdiction in a custody situation is well recognized, Restatement (Second) Conflict of Laws § 79 (1971), we do not believe that such a situation exists here. First, unlike the State of Montana, the jurisdiction of the Blackfeet Tribal Court is limited and does not extend to the full range of domestic relations incidents. Chapter 3 of the Blackfeet Tribal Law and Order Code explicitly disclaims tribal jurisdiction over marriage, divorce and adoption. The Code defers to state law and state jurisdiction for proceedings in those areas.[5] We interpret this relinquishment of jurisdiction to encompass a surrender of jurisdiction over custody determinations incident to divorce ac-

tions as well. The appellants, however, contend that Chapter 3, Section 6 of the Blackfeet Tribal Law and Order Code entitled "Proceedings for the Termination of the Parent-Child Relationship" gave the Tribal Court authority for its action. We disagree. The provision cited by the appellants deals with child neglect and abandonment on the Reservation. Only a strained reading can support application of that provision to this child custody struggle which is characterized by the very opposite of parental neglect. Moreover, nowhere in the detailed Code provisions is there any reference to the child custody determinations coincident with divorce. Rather, Section 6 contains the disclaimer:

"This judicial action is intended primarily for those situations where other judicial remedies appear inappropriate, and is not intended to modify Sections 1, 2 and 3 of Chapter 3 of the Blackfeet Tribal Law and Order Code dealing with the applicability of State laws to marriage, divorce and the determination of paternity."

We therefore conclude that the Tribal Court lacked jurisdiction to determine the custody of the Cobell children and that the court's order restraining the children was unlawful. The writ of habeas corpus was properly granted.

Judgment affirmed.

DUNIWAY, Circuit Judge (dissenting):

I dissent, on two alternative grounds.

First, I am of the opinion that this case is moot. After these appeals were filed, this court denied a stay of the district court's order on January 3, 1973. On the same day, tribal Chief Judge

---

5. The Blackfeet Tribal Law and Order Code states at Chapter 3, as follows:
"Section 1, Marriages.
"All members of the Blackfeet Indian Tribe shall hereafter be governed by State law and subject to State jurisdiction with respect to marriages hereafter consummated. Common law marriages and Indian custom marriages shall not be recognized within the Blackfeet Reservation.

"Section 2, Divorces.
"All divorces must be consummated in accordance with the State law of Montana. Indian custom divorces are from this time on illegal and will not be recognized as lawful divorces on the Blackfeet Reservation."

Sharp entered the order set out in footnote 2 to Judge Trask's opinion. Judge Sharp's order does more than vacate the temporary restraining order that he had entered, it affirmatively awards custody of the children to Henry Cobell. We are advised that Henry has in fact taken custody, and that the children are with him in Billings, Montana, off the reservation, where he has been attending college. Henry has thus obtained from Judge Sharp the exact relief that he sought from the United States District Court.

The possibility that the children may at some time be brought back to the reservation is not, in my view, a basis for saying that the action is not moot. I think that the possibility is far too speculative. I cannot believe that Henry, while he has custody, will take them back to the reservation. If the Montana court should award custody to Joan, she would be entitled to take them there. Only if she did so, and then only if Henry were again successful in reversing the Montana court's order, would there be a possibility of another resort to Judge Sharp's court. Such a possibility is, to me, too remote to warrant a holding that this case is not moot. If it should occur, the background of the case would be substantially different from what it is now, and Judge Sharp might well, at such a time, refuse to enter an order similar to his order of October 6, 1972. If he should enter another order, it would be in the light of a different factual background from that of this case.

Second, assuming that the case is not moot, I would vacate and remand on the ground that the court should have abstained until Henry had exhausted his remedies in the tribal court.

Regardless of what Judge Sharp may have said about this jurisdiction and his desire to have the question settled or his belief that the question ought to be settled in a Federal Court, I find nothing in the record indicating that Henry could not have appeared and moved to set Judge Sharp's order aside, and nothing indicating that, had he done so, Judge Sharp would have refused to hear him. Moreover, and more important, we do not, in habeas corpus cases, permit the by-passing of state remedies merely because the state law, or something that a state court has said, makes it appear probable that the petitioner's use of state remedies will not succeed. As we said in Morehead v. State of California, 9 Cir., 1964, 339 F.2d 170, 171: " 'Ineffectiveness' of State relief cannot be established if no attempt is made to obtain that relief." See also Pate v. Wilson, 9 Cir., 1965, 348 F.2d 900, 901. I would apply the same principle to tribal courts.

In addition, if Henry were unsuccessful in Judge Sharp's court, he could have appealed. The Blackfeet Tribal Law and Order Code sets up an Appellate Court (Blackfeet Tribal Law and Order Code, Ch. 1, Sec. 5). There is nothing in the record to indicate that Henry, if unsuccessful before Judge Sharp, could not have appealed. See Darr v. Burford, 1950, 339 U.S. 200, 208, 70 S.Ct. 587, 94 L.Ed. 761.

For the reasons stated in O'Neal v. Cheyenne River Sioux Tribe, 8 Cir., 1973, 482 F.2d 1140, I would apply the exhaustion of remedies doctrine to habeas corpus cases under 25 U.S.C. § 1303 which involve detention under orders of tribal courts. Those courts will never become the effective instruments for the administration of justice that they are supposed to be if every time one of them issues an order for detention the person detained, or someone acting on his behalf, can immediately inject a federal district court into the proceedings by asking for a writ of habeas corpus. The other two cases cited by Judge Trask, Dodge v. Nakai, D.Ariz., 1968, 298 F. Supp. 17, and McCurdy v. Steele, D. Utah, 1973, 353 F.Supp. 629, are distinguishable. See O'Neal, supra, 482 F.2d at 1146.

If it were clear that Judge Sharp had no jurisdiction, I might reach a different result. But he did have jurisdiction. The Blackfeet Tribal Law and Order Code, Chapter 3, Domestic Relations,

Sec. 6, D, confers upon the Tribal Court "original jurisdiction over petitions to terminate the parent-child relationship when the child involved is present on the Blackfeet Indian Reservation." This is precisely the jurisdiction that Judge Sharp purported to exercise. Whether he exercised his jurisdiction properly is another question, and as to that question I would require exhaustion of tribal remedies.

I would vacate the order of the district court and remand with directions to dismiss the proceedings as moot. Alternatively, I would vacate and remand with directions to dismiss without prejudice pending exhausting tribal court remedies.