[No. E000976. Fourth Dist., Div. Two. Oct. 24, 1985.]

JACK ZACHARY et al., Plaintiffs and Respondents, v.
ALLAN WILK et al., Defendants and Appellants.

COUNSEL

Tuttle & Taylor, Joseph R. Austin, Spurgeon E. Smith and Richard I. Roemer for Defendants and Appellants.

O'Donnell & Gordon, Pierce O'Donnell, George R. Hedges, Cornelius P. McCarthy, Hirschi & Clark and Toni Tweedle Healy for Plaintiffs and Respondents.

OPINION

McDANIEL, J.—This case presents the issue of whether a municipal rent control ordinance may be enforced against a non-Indian lessee of property

held in trust by the United States Government for reservation Indians. More specifically, the Indio Branch of the Riverside Superior Court granted a preliminary injunction at the instance of the non-Indian tenants of Royal Palms, a mobilehome park on Indian land in Cathedral City, prohibiting their non-Indian landlords Allan Wilk and Royal Palms Mobile Home Park, Ltd. (defendants) from imposing rent increases in excess of the amount permitted by the recently enacted Cathedral City rent control ordinance. Defendants appealed, contending: (1) the ordinance is a local regulation which cannot be applied to Indian lands; (2) the ordinance is preempted by the comprehensive federal scheme governing leases on Indian lands; and (3) the ordinance is prohibited because its provisions interfere with tribal self-government.

## FACTS

Royal Palms is a mobilehome park which is located on approximately 40 acres of land in Cathedral City. The land is held in trust by the United States for two members of the Agua Caliente band of Cahuilla Indians. Defendants leased the land from the two owners in return for a minimum annual rental fee plus a percentage of the gross receipts from the operation of Royal Palms. The lease was entered into in 1980 and expires on or about December 31, 1989. Unless otherwise indicated, the following events occurred in 1983.

On March 8, ordinance No. 48 (the ordinance) was approved by a majority of the voters of Cathedral City. On March 15, the ordinance was adopted by the city council, with an effective date of March 25. The ordinance is entitled "AN ORDINANCE OF THE CITY OF CATHEDRAL CITY ESTABLISHING A MOBILEHOME FAIR PRACTICES COMMISSION," and provides in relevant part: "Section 1. *Definitions* . . . 'Maximum Rent Increase'—From the effective date of this ordinance . . . no mobilehome park owner of any mobilehome space covered by this ordinance shall request, demand or receive a rent increase in any twelve (12) month period in excess of three-fourths (¾) of the increase in the cost of living as indicated in the Consumer Price Index. No mobilehome park owner shall be entitled to more than one such rent increase in any twelve-month period. . . .

"Section 2. *Applicability* [¶] A. The provision of this ordinance shall apply to mobilehome parks located within Cathedral City and to those rental spaces in a mobilehome park which are located entirely within the Cathedral City limits."

The ordinance also provides for the establishment of a Mobilehomes Fair Practices Commission (the commission), for the purpose of hearing and determining, among other things, tenants' petitions for review of mobilehome park owners' actions pursuant to the ordinance.

In apparent reliance on a legal opinion that the ordinance would not apply to Indian land, on March 25 defendants informed the tenants of Royal Palms whose leases were due to expire on June 1 that there would be a rent increase of 12 percent per year as of June 1. (Defendants had imposed a similar increase the previous year, and it was that increase which had initiated the events culminating in the adoption of the ordinance.)

On April 20, a tenant of Royal Palms petitioned the commission to review defendants' proposed 12 percent rent increase. After a hearing, the commission determined that the increase violated the ordinance, in that the relevant Consumer Price Index increase was less than 1 percent. Defendants raised the federal preemption issue in the commission proceedings, and the commission abstained from ruling thereon.

Thereupon 5 residents of Royal Palms filed an action against defendants on behalf of themselves and the other 845 residents of Royal Palms (plaintiffs) for a declaration of their rights under the ordinance, and for damages as provided in the ordinance. (As to damages, the ordinance recites: "If a mobilehome park owner demands, accepts, receives or retains any space rent payment in excess of the amounts permitted by this ordinance, residents may recover said sum from mobilehome park owner as actual damages, together with a civil penalty of $500.00 per violation, and reasonable attorney's fees as determined by a court of competent jurisdiction.") Plaintiffs' complaint also included several tort counts and one contract count.

Defendants removed the case to the federal district court, claiming that the primary issue was that of federal preemption.[1] Plaintiffs moved to have the case remanded to state court, and their motion was granted on the basis that preemption as a defense was not ground for removal jurisdiction.

Plaintiffs then noticed a motion for a preliminary injunction and a temporary restraining order, seeking to prevent defendants from imposing a rent increase greater than the increase permitted by the ordinance. Attached to plaintiffs' motion was a letter to the Director of the Bureau of Indian Affairs from each of the two owners of the land on which Royal Palms is located. Each of the letters recited in relevant part: "1 . . . as co-landowner of the Royal Palms Mobile Home Park lands . . . wish to make it known that I concur with the provisions of the [ordinance]."

Defendants' opposition to plaintiffs' motion for a preliminary injunction and a temporary restraining order was accompanied by a declaration of

---

[1] In defendants' first amended answer to plaintiffs' complaint (the original answer is not in the record) defendants alleged as an affirmative defense that "The Fair Practices Ordinance cannot be applied to Royal Palms because Royal Palms is on Indian land and said Ordinance is, therefore, preempted by federal law (28 U.S.C. § 1360) governing the use and regulation of Indian lands."

Barbara Gonzales, the Chairman of the Tribal Council of the Agua Caliente Band. The declaration recited, in relevant part: "The following . . . states the official position of the Agua Caliente Band of Cahuilla Indians. . . . We reject the attempted involuntary application of this law to our lands because the Fair Practices Ordinance, if applied to Indian trust lands would infringe on the Band's right to govern and manage the use of the lands of the Agua Caliente Indian Reservation. The Agua Caliente Band has, since 1977, applied its own comprehensive land use controls (i.e., general plan, zoning, building codes, etc.) to that portion of the trust lands of the Agua Caliente Indian Reservation located in Palm Springs. The Band is now in the process of doing so for the other portions of the reservations, including those trust lands located in Cathedral City. With regard to such lands in Cathedral City, the Tribal Council strongly opposes, and does not recognize, any effort of the City to limit the Band's authority to apply its own land use controls to trust lands. . . .

". . . Moreover, the Agua Caliente Band has determined not to enact any ordinance prohibiting rent control of leased reservation trust lands. We feel strongly that the Agua Caliente Band does not have to enact any such negative legislation prohibiting external rent control laws in order to prevent local non-Indian governments from attempting to regulate the use of our lands. This policy decision of the Agua Caliente Band not to enact any legislation controlling rents on Indian trust lands is sufficient exercise of our right of self-government to foreclose any attempt by local or state government to legislate in this area."

After a hearing on plaintiffs' motion, on November 9, the trial court granted the motion as to those plaintiffs who had not signed leases before the effective date of the ordinance. Defendants were enjoined from imposing rent increases at Royal Palms in excess of the amount permitted by the ordinance, and from engaging in any retaliatory acts against the residents of Royal Palms pursuant to the ordinance.

As to the preemption issue, the court's amended statement of decision of January 12, 1984, recited in relevant part: "The Court rejects Defendants' assertion of federal preemption of the . . . [ordinance] because Royal Palms is located on land owned by Indian Allottees. The contractual relationship regulated by the Ordinance is the lease relationship between the non-Indian Defendant-landlords and their non-Indian Plaintiff-tenants [A] separate agreement exists between the Defendants and the Indian Allottees under which the Defendants use the land . . . . While the assignment is regulated by federal law insofar as its terms are subject to approval by the Bureau of Indian Affairs, the lease relationship regulated by the Ordinance is not [¶] The Court finds . . . that there is no interference with, much less intrusion upon, tribal government in this case. The Agua Caliente Tribe cannot claim

any direct or indirect contractual or economic interest in the application of the [ordinance] to Royal Palms. . . .

"Tribal government could be implicated in this case only if the Tribe itself claimed that imposition of the Ordinance to Royal Palms somehow imperiled 'the subsistence or welfare of the tribe.' [Citations.] The Court finds, however, that no such claim could be made in this case. The Allottees . . . receive a return on their land under terms of an assignment which has already been approved by the BIA. The Ordinance has no 'subsistence' effect on the tribe itself."

## DISCUSSION

■ Defendants contend first that *local* regulations such as the ordinance cannot be applied to or enforced on Indian lands. We agree.

■ " 'Indian tribes are unique aggregations possessing "attributes of sovereignty over both their members *and their territory*," ' " [citations]. Because of their sovereign status, tribes *and their reservation lands* are insulated in some respects by an 'historical immunity from state and local control,' [citation]." (*New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324, 332 [76 L.Ed.2d 611, 619, 103 S.Ct. 2378, 2385, italics added.] "[B]oth the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, . . . [A]s a necessary implication of this broad federal commitment, we have held that tribes have the power to manage the use of its [*sic*] *territory* and resources by both members and non-members, [citations], [and] to undertake and regulate economic activity within the reservation, [citation]." (*Id.,* 462 U.S. at pp. 335-336 [76 L.Ed.2d at p. 621, 103 S.Ct. at pp. 2386-2387], italics added.)

" ' ' "[A]bsent governing Acts of Congress," ' " a State may not act in a manner that " ' "infringed on the right of reservation Indians to make their own laws and be ruled by them." ' ' [Citations.]" (*New Mexico* v. *Mescalero Apache Tribe, supra,* 462 U.S. 324, 332 [76 L.Ed.2d 611, 619, 103 S.Ct. 2378, 2385].) "While under some circumstances a state may exercise concurrent jurisdiction over non-Indians acting on tribal reservations [citations], such authority may be asserted only if not pre-empted by the operation of federal law. (*Id.*) The exercise of state authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity." (*Id.,* at p. 336 [76 L.Ed.2d at p. 622, 103 S.Ct. at p. 2387].)

The federal statute permitting states to exercise civil and criminal jurisdiction over Indian tribes is Public Law No. 280, 28 United States Code section 1360. Public Law No. 280 provides in relevant part:

"§ 1360 . . . (a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State: . . .

"California . . . . All Indian country within the State. . . .

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section."

In 1972, the United States District Court for the Central District of California held that Public Law No. 280 applied to cities and counties as well as to states, and that Palm Springs could enforce its zoning ordinances on Indian lands within its territory. (*Agua Caliente Band, etc.* v. *City of Palm Springs* (C.D.Cal. 1972) 347 F.Supp. 42.) On January 24, 1975, the Ninth Circuit vacated *Agua Caliente* in an unpublished order. (*Capitan Grande Band of Mis. Indians* v. *Helix Irr. Dist.* (9th Cir. 1975) 514 F.2d 465, 468, fn. 3.)

Later that same year, in *Santa Rosa Band of Indians* v. *Kings County* (9th Cir. 1975) 532 F.2d 655, the Ninth Circuit held, as a matter of first impression, that the permissive provisions of Public Law No. 280 did *not* apply to local regulations, and refused to allow Kings County to enforce its zoning ordinance and building code against two mobilehomes which were located on the Santa Rosa Band's reservation and owned by two members of the band. The court analyzed the legislative history of Public Law No. 280, and concluded that "[a] construction of P.L. 280 conferring jurisdiction to local county and municipal governments would significantly undermine, if

not destroy . . . tribal self-government. By transferring regulation of all matters of local concern to local governments, the tribal government would be left little or no scope to operate. We think it more plausible that Congress had in mind a distribution of jurisdiction which would make the tribal government over the reservation more or less the equivalent of a county or local government in other areas within the state, empowered, subject to the paramount provisions of state law, to regulate matters of local concern within the area of its jurisdiction." (*Id.*, at pp. 662-663.)

The *Santa Rosa* court also reasoned that "Indians, who do not own the fee to reservation lands, are unable under many state laws to incorporate reservation lands in order to acquire law-making powers. See Cal. Gov't Code § 34301 (West Supp. 1974). Thus [to interpret Public Law 280 as applying to local regulations] would not only ascribe to Congress the intent substantially to strip Indian tribes of their sphere of self-regulation, but also to leave them in the unequal position of being unable to obtain the measure of self-determination provided by state laws to its other citizens." (*Santa Rosa Band of Indians* v. *Kings County, supra,* 532 F.2d 655, 663.)

The following year the United States Supreme Court cited *Santa Rosa* with apparent approval in *Bryan* v. *Itasca County* (1976) 426 U.S. 373 [48 L.Ed.2d 710, 96 S.Ct. 2102], and stated that "nothing in [the] legislative history [of Public Law No. 280] remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than ' "private, voluntary organizations," ' [citation]." (*Id.*, at p. 388 [48 L.Ed.2d at p. 721].) (*Bryan* held that Public Law No. 280 did not give the State of Minnesota authority to tax Indian personal property situated on a tribal reservation.)

Four years later, in *United States* v. *County of Humboldt* (9th Cir. 1980) 615 F.2d 1260, the Ninth Circuit relied upon *Santa Rosa* to hold that Humboldt County could not enforce its zoning and building codes against four Indian construction projects on the Hoopa Valley Reservation. In response to Humboldt County's request that *Santa Rosa* be overruled, the court said that it "continue[d] to believe that *Santa Rosa* was correctly decided." (*Id.*, at p. 1261.)

██ In view of all the above, and finding no authority to the contrary, we are persuaded that the foregoing holding in *Santa Rosa* applies to and controls this case. ██ ██ ██ We therefore hold that the Cathedral City rent control ordinance at issue cannot be enforced against Royal

Palms, because the ordinance is a local regulation and Royal Palms is on Indian land.[2]

Plaintiffs attempt to distinguish *Santa Rosa* and *Humboldt* on the grounds that those cases involved *Indian* use of Indian lands, whereas this case involves only *non-Indian* relations which "happen to take place" on Indian land, and only indirectly and incidentally affect the land and the Indian owners' interest therein. We disagree, for the following reasons.

First, the crucial feature of the *Santa Rosa* holding, as expressed by the Ninth Circuit in *Humboldt*, was the Indian character of the *land*, and not its *users* ("[In *Santa Rosa* we] held that Kings County was without jurisdiction to enforce its zoning ordinance or building code on Indian reservation trust *lands*, and that Pub.L. 280, 28 U.S.C. § 1360, did not grant the county jurisdiction to do so.") (*United States* v. *County of Humboldt, supra,* 615 F.2d 1260, 1261, italics added.) Moreover, the United States Supreme Court "has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry. . . . '"The cases in this Court have consistently guarded the authority of Indian governments over their reservations."' [Citations.]" (*White Mountain Apache Tribe* v. *Bracker* (1980) 448 U.S. 136, 151 [65 L.Ed.2d 665, 677, 100 S.Ct. 2578].) (In *White Mountain,* the court held that the State of Arizona could not apply its motor carrier license and use fuel taxes to two non-Indian corporations operating on an Indian reservation.)

Second, plaintiffs attempt to minimize the ordinance's effect on the band's sovereignty by claiming that the ordinance affects only non-Indian relationships which just "happen to take place" on Indian land is disingenuous.

"California has no state rent control statute." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 141 [130 Cal.Rptr. 465, 550 P.2d 1001].) The regulation of rents is a valid exercise of *municipal* police power. (*Id.,* at pp. 140-147.) In this case, the official position of the band, as expressed by Barbara Gonzales, *ante,* was that it was in the process of applying its own "comprehensive land use controls" to its land in Cathedral City, and

---

[2]We do not hold that no local regulation may ever be enforced in regard to any activity on Indian property. "The intention of the federal government expressed in the Code of Federal Regulations contemplates control by both the state and local governments of the activities on Indian lands through laws and ordinances *whenever the Secretary of the Interior adopts and makes those laws and ordinances applicable to Indian property.*" (*County of San Bernardino* v. *La Mar* (1969) 271 Cal.App.2d 718, 723 [76 Cal.Rptr. 547], italics added.) (See also *City of Sault Ste. Marie, Mich.* v. *Andrus* (D.D.C. 1980) 532 F.Supp. 157: "It has long been the position of the Department of Interior that municipal land use laws may not be enforced on tribal trust lands *except as permitted by the Secretary.*" (*Id.,* at p. 165, italics added.) The record here reveals no action by the Secretary of the Interior in regard to the ordinance.

that it did not want a local, non-Indian government to regulate rents on *"our lands."* (Italics added.)

Plaintiffs attempt to discount the effect of Gonzales' declaration by claiming that: (1) the declaration does not contain the magic formula that the ordinance would "imperil the subsistence or welfare of the tribe," and (2) the fact that the Indian owners did not oppose the ordinance is the "best evidence" that the impact of the ordinance *on Indians* is "minimal." However, as to the "subsistence or welfare" test, it was applied in *Montana* v. *United States* (1981) 450 U.S. 544 [67 L.Ed.2d 493, 101 S.Ct. 1245] to a *state's* authority to regulate hunting and fishing on Indian land by non-Indians *who had not entered into "any agreements or dealings with the [Indian owners of the land] so as to subject themselves to tribal civil jurisdiction."* (*Id.,* at p. 566 [67 L.Ed.2d at p. 511], italics added.) This is not such a case, and the *Montana* test was improperly applied here by the trial court. Moreover, claiming that a *state* test should be applied to a *local* regulation, plaintiffs are ignoring *Santa Rosa's* holding to the effect that when a *local* regulation is applied to Indian lands, it is the *form* (i.e., local nature) of the regulation rather than its *content* which interferes with the Indians' sovereignty. (Significantly, there is no reference in the trial court's amended statement of decision to the effect of the ordinance, *as a local regulation,* on tribal government.) Also, although we need not decide the issue, in view of the Supreme Court's statement in *Montana* that "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, *leases,* or other arrangements" (*id.,* at p. 565 [67 L.Ed.2d at p. 510]), the ordinance may be inapplicable to Royal Palms on the basis of its content as well as its form.

Further, the fact that the Indian owners of the Royal Palms land did not oppose the ordinance is irrelevant to the sovereignty issue, because those owners had no authority to speak on behalf of the band. Moreover, Gonzales, who had such authority, stated in her declaration that "it is a policy of the Band to permit the individual Indian allottee to exercise her or his own discretion with respect to the economic return the individual allottee desires from the land. [¶] This policy of deference does not, however, extend to external actions such as the Fair Practices Ordinance adopted on March 8, 1983, by the voters of Cathedral City."

At oral argument, in response to a question from the panel, plaintiffs contended that the band did not have the authority to impose rent control regulations on land allotted to *individual* Indians, as opposed to land allotted to the *tribe.* Defendants disputed this contention. We asked the parties to submit supplemental briefs on the issue, and they have done so.

We find no support in plaintiffs' supplemental brief for their claim that the band's authority does not extend to land held by individual allottees.

Plaintiffs rely principally on *Northern Cheyenne Tribe* v. *Northern Cheyenne, etc.* (9th Cir. 1974) 505 F.2d 268, where the court held that the tribe had no equitable interest *in mineral deposits* in reservation land which had been allocated to individual members of the tribe. However, *Northern Cheyenne Tribe* was reversed by the United States Supreme Court on precisely that issue in *Northern Cheyenne Tribe* v. *Hollowbreast* (1976) 425 U.S. 649 [48 L.Ed.2d 274, 96 S.Ct. 1793]. Moreover, neither the Ninth Circuit opinion in *Northern Cheyenne Tribe* nor any other authority cited by plaintiffs addressed the issue of whether a tribe could exercise sovereignty *over* land allotted to its members.

Finally, the local regulations which were precluded in *Santa Rosa, supra,* had been applied to land owned by individual allottees, and, in its reasoning, the court did not distinguish between tribal and individually owned land ("Congress did not contemplate immediate transfer to local governments of civil regulatory control over *reservations.* . . . Congress had in mind a distribution of jurisdiction which would make the tribal government over the *reservation* more or less the equivalent of a county or local government in other areas within the state.") (*Santa Rosa Band of Indians* v. *Kings County, supra,* 532 F.2d 655, 662-663, italics added.)

Otherwise plaintiffs rely on *Agua Caliente Band of Mission Ind.* v. *County of Riverside* (9th Cir. 1971) 442 F.2d 1184 and *Fort Mojave Tribe* v. *San Bernardino County* (9th Cir. 1976) 543 F.2d 1253, where the Ninth Circuit held that California's possessory interest tax could be imposed on non-Indian lessees of Indian lands. However, the case before us here is neither a state regulation nor a taxation case. Moreover, on the sovereignty issue, the *Fort Mojave* court concluded that the imposition of the state tax would *not* impair the ability of the tribe to impose its own tax, because the taxes would be imposed "by two different and distinct taxing authorities." (*Id.,* at p. 1258.) (See also this court's decision in *Palm Springs Spa, Inc.* v. *County of Riverside* (1971) 18 Cal.App.3d 372 [95 Cal.Rptr. 879], where Justice Gardner wrote: "[P]laintiff asserts that the imposition of the possessory interest tax in the instant case constitutes an infringement on the sovereignty of the Agua Caliente Band of Mission Indians, which proposes to levy a 2 percent tribal tax on plaintiff. . . . In a federal system of dual sovereignties, it is common for multiple authorities to impose taxes on a single source of revenue, be it an income, a sales transaction, or a parcel of property. Consequently, it is not uncommon for similar sources of revenue to be taxed at varying rates. We perceive no infringement of the tribal sovereignty." (*Id.,* at pp. 379-380.))

In this case, however, the imposition of Cathedral City's rent control ordinance would *preclude* the tribe from either imposing its own rent control ordinance on defendants, or refusing to subject any of the tribes' leased property to rent controls of any kind. Such a situation would not be one of

dual sovereignty or multiple authority, but one on which the reservation would be nothing more than a "tax-free [piece] of property, totally subject to regulation by local governmental entities as well as the state." (Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians* (1975) 22 UCLA L.Rev. 535, 581.)

In view of our decision that the ordinance is unenforceable as a local regulation, we need not address defendants' contentions that the ordinance is otherwise unenforceable because it is preempted by comprehensive federal regulations governing the leasing of Indian lands, or because its provisions interfere with tribal self-government.

After we filed our opinion, plaintiffs petitioned for rehearing, contending for the first time that the appeal is moot. In support of this contention plaintiffs claim that on January 14, 1984, about two months before the appeal was filed, the band "formally adopted" the ordinance by agreeing with Cathedral City to apply all its land use regulations to the Indian lands within the city. However, plaintiffs' contention that there is no longer an "'actual controversy'" (*Paul* v. *Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924]) as to the application of the ordinance to Indian land is meritless, in view of the fact that over a year after the foregoing agreement, the band and Cathedral City were still litigating the issue in federal district court (*Knapp, etc. et al.*, v. *City of Cathedral City, etc., et al.* (1984) C.D. Cal., No. CV 84-3678 AAH (Mcx).

### DISPOSITION

The trial court's order of January 12, 1984, granting plaintiffs' application for a preliminary injunction is reversed.

Kaufman, Acting P. J., and Rickles, J., concurred.

A petition for a rehearing was denied November 22, 1985, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied February 13, 1986.