[No. E015369. Fourth Dist., Div. Two. Jan. 31, 1997.]

In re the Marriage of RANDY and DEBRAH PURNEL.
RANDY PURNEL, Respondent, v.
DEBRAH PURNEL, Appellant.

**COUNSEL**

Alexander & Karshmer and Richard A. Cross for Appellant.

Richard C. Houghton and Virginia Criste for Respondent.

## Opinion

**McDANIEL, J.***—In a postjudgment proceeding, following an earlier decree of dissolution of the marriage of the parties, the trial court ordered Debrah Purnel (wife), the noncustodial parent of the parties' three minor children, to make payments of $1,063 per month per child, respectively, for their support. Such order reflected a DissoMaster calculation which showed wife's "net guideline income before support" to be $9,888 per month.

Wife does not challenge the DissoMaster figure nor how it was calculated. Neither does she challenge the amount of the support order itself. However, she is unwilling to share the fruits of her affluence with her own children. Hence, the appeal. To characterize wife's attitude, as stated in one of the written filings on her behalf in the trial court, wife "simply does not want to submit to State Jurisdiction in this regard. She is not being obstinate—it is a federally protected right not to have State Courts interfere in allocation of Indian Land Trust monies." As implied by the foregoing, wife is a Native American and a member of the Agua Caliente Band of the Cahuilla Indians. As such, she is the beneficiary of five lucrative leases of her Indian Trust Allotment lands.

Wife's principal position on appeal, as stated in her opening brief, is that the State of California has no jurisdiction "to tax Indian reservation lands or the income earned by Indians from activities carried on within the boundaries of the reservation."

Such contention is not responsive to any issue presented by this record. In our view, there can be no question that the trial court had jurisdiction to make the child support order it made here. Moreover, such order, by its terms, expressly announced that the court was not involving itself in wife's trust allotment or the income therefrom. The minute order preceding issuance of the final written order fixing the amount of child support recited, "[t]he court . . . finds that an order for [child] support . . . does not violate 25 U.S.C. [section] 410, in that [the] court is merely making a determination as to [wife's] ability to pay child support . . . and render[ing] an Order pursuant to such a finding, but is not designating, nor ordering it to be paid from any particular source." Otherwise, the minute order recited that ". . . there is no interference by the Court with any [Indian] tribal interests in that the Order of the Court . . . is not . . . against [wife's] Indian Trust Allocations." The foregoing recital by the trial court, as will be more fully discussed, *post*, represented a considered resolve by the trial court not to infringe upon any federally protected rights of a Native American.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Under Public Law No. 280 (28 U.S.C. § 1360 (Public Law 280)), California is one of six states upon which Congress has conferred "jurisdiction over civil causes of action between Indians or to which Indians are parties . . . ." Pursuant to the jurisdiction so conferred, the trial court here, in a civil action to which an Indian (wife) is a party, issued an order fixing wife's child support obligation. As will be more fully discussed, *post*, this Public Law 280 jurisdiction over civil causes of action includes domestic relations matters, at least in cases with facts reflecting those before us. As noted, otherwise, the order literally declined to designate any source of funds to be used in discharging the support obligation. Thus, any contention that this support order is an effort to "tax Indian reservation lands or income earned by Indians" is ill-advised, if not disingenuous.

Because the order here challenged is one which we hold the trial court had jurisdiction to make, and because the propriety of the order is not otherwise questioned by wife, we shall affirm it accordingly.

### SYNOPSIS OF THE TRIAL COURT PROCEEDINGS

At the instance of Randy Purnel (husband), who is not a Native American, a judgment of dissolution of marriage of the parties was obtained in 1992. To that judgment was attached an extensive (16 pages) marital settlement agreement from which it appears that the parties had been married for over 10 years and that they have had 3 minor children. Paragraph 21 of this agreement provided for joint legal and physical custody of the children with no specified times for respective visitation by the parties. Paragraph 22 provided that "neither party shall be required to pay child support to the other." However, it provided further that wife would "continue" to pay all expenses for the children's tuition, clothing and unreimbursed medical expenses. As of this writing, these children are aged twelve, nine and eight, respectively. Otherwise, included among the 13 items awarded to wife from the parties' community property or confirmed as her separate property by the agreement, were: (a) the family residence located at 68-320 Bahada Road, Cathedral City, California; (b) a 23-foot Rollalong motor home; (c) a residential lot located on Milo in Palm Springs, California; (d) a residential lot located on Bahada in Palm Springs; (e) a residence located in Jackson Hole, Wyoming; (f) an I.D.S. annuity; (g) a 1975 Porsche; and (h) a 1990 BMW.

In the course of the dissolution proceeding, wife filed a declaration to which she attached a copy of a letter addressed to her by the director of the Bureau of Indian Affairs' Palm Springs office. That letter included a tabulation of the lessees of wife's allotted trust lands and the annual income derived therefrom as follows:

| | | |
|---|---|---|
| 1. | Royal Palms Mobile Park | $22,280.73 |
| 2. | DeAnza Corporation | $89,235.85 |
| 3. | Palm Tennis Club | $16,349.34 |
| 4. | Falcon Lakes Properties | $81,186.92 |
| 5. | Sports Arena, Inc. | $29,057.00 |

The aggregate annual rental from these five leases amounts to $238,109.84.

A year and several months after entry of the judgment of dissolution, for reasons which appear to have been related to wife's alcoholism, husband obtained issuance of an order to show cause re modification of: (1) child custody; (2) child support; (3) child visitation; and (4) attorney fees. In support of this endeavor, husband filed the requisite income and expense declaration. At the initial hearing of the matter, the parties stipulated to a so-called parenting agreement. They further stipulated to undergo counseling with Dr. Patricia F. Marzicola. The stipulation "contemplated" that wife would "enter a dual-diagnosis in-patient treatment program at Capistrano By the Sea, or a similar facility."

Otherwise, in the court-recited stipulation, wife was recognized as not conceding "that this Court has exclusive or concurrent jurisdiction over the Native-American children of the parties."

Concurrently, the parties entered into a so-called "Supplemental . . . Custody/Visitation Agreement."

Anticipating a court review of the counseling results and further hearing of the order to show cause, husband executed and filed a further declaration.

Otherwise, husband filed an updated income and expense declaration.

For her part, also anticipating a further hearing of the order to show cause, wife filed an extensive "reply brief" devoted to an effort to show that the state court had no jurisdiction to rule on the issues raised by the order to show cause. More particularly, the entire thrust of this 15-page filing was to demonstrate that any effort to reach the income from wife's allotted trust lands was illegal under federal statutes and the cases interpreting them. As part of the "Conclusion" to this commentary, the author also stated, "[i]t also follows [from] the above authorities that there is no State Court jurisdiction over attorneys fees and costs herein out of Indian Lease Land allocation/ allotments to be received by [wife]."

Husband submitted a reply memorandum of points and authorities to wife's filing above noted. Such reply concluded with the observation that "[husband] is not seeking an assignment of Indian trust property or monies. When [wife] receives her monies [from the Bureau of Indian Affairs], she deposits them in a bank account at a banking institution just like any other person. [Husband] requests that [wife] pay child support . . . out of monies that she has received from her leasing of Indian Land."

With these filings before it, the trial court proceeded to a further hearing of the order to show cause regarding modification. One of the items received in evidence at this hearing was a letter addressed to the court mediator, serving in the family conciliation court, from Dr. Patricia F. Marzicola. Such letter reported on the results of her counseling with the parties and included a recommendation concerning custody and visitation.

About three months after the hearing, the trial court issued and filed its "findings and order after hearing." Such order awarded legal custody jointly to both parties with physical custody to husband. Wife was ordered, as earlier noted, to pay $1,063 per month per child as and for their respective support, together with $2,500 in attorney fees. The order also contained specific conditions concerning wife's rights of visitation. They were as follows:

"A. Mother shall have open but supervised visitation with the children as long as the person supervising can establish that she is not under the influence of drugs or alcohol.

"B. Visitation shall be supervised by the maternal grandmother, maternal grandfather or any other person the parents mutually agree upon.

"C. Children shall not be removed from the State of California without the agreement of both parents.

"D. The children shall be seen in therapy to help them understand and adjust to their situation according to their age level. Length of time shall be determined by the therapist."

After entry of the foregoing order, wife initiated her appeal.

## Discussion

■ As earlier noted, wife's sole challenge to the order for child support and attorney fees is that the trial court lacked subject matter jurisdiction; she

argues that there is no jurisdiction because of the application of various federal statutes and cases interpreting them.

At the outset of her opening brief, wife recites a summary of her argument. "This is an appeal by the beneficial owner of a leased allotment located within the Agua Caliente Reservation, challenging the order of the court below insofar as it required her to pay child support and attorney's fees to her former husband. The court lacked authority to issue the order (1) because it determined the amount of child support which the allottee was required to pay based exclusively on her restricted leasehold income from her trust allotment and (2) because it required the payment of this amount, even though the undisputed evidence showed that the income from her allotment was the only income she had. [¶] The court lacked authority to issue such an order because it was preempted from doing so by 25 U.S.C. §§ 410 and 415, and, in addition, because it lacked jurisdiction under the body of federal statutory and common law which precludes the states from imposing any tax or charge against any interest in a trust allotment; because the federal courts have exclusive jurisdiction of actions involving interests in allotments; and because Section 1360(b), as construed by the California Supreme Court in *Boisclair*[1], effectively requires that state courts abstain from exercising jurisdiction in any proceeding which *may* involve or affect an interest in Indian property. [¶] In addition, the court erred in holding that it had jurisdiction under 28 U.S.C. § 1360 to issue the disputed order." (Italics in original.)

We have included the foregoing lengthy exposition of wife's position in our discussion in order to enable pointing out, first, that wife has mischaracterized the legal result of what happened in the trial court and, second, as a consequence, that her legal contentions beg the question as to any issue presented by the record on appeal.

Wife has questioned the jurisdiction of the California trial court to make the orders it did by choosing narrowly to argue that such orders disregarded the immunity of Indian Trust Allotment lands and the immunity of any other real or personal property of Native Americans from state or local taxation (see, for instance, *Bryan* v. *Itasca County* (1976) 426 U.S.373 [96 S.Ct. 2102, 48 L.Ed.2d 710], *post* at p. 534). Even though such argument misses the mark, as noted, it imports by necessary implication the more fundamental issue, under Public Law 280,[2] of whether the trial court had jurisdiction to make any child support order at all.

Although Public Law 280 has been on the books since 1953, there has been no definitive pronouncement in a single decision of what was finally

---

[1]*Boisclair* v. *Superior Court* (1990) 51 Cal.3d 1140 [276 Cal.Rptr. 62, 801 P.2d 305].
[2]In pertinent part, Public Law 280 provides:

meant when Congress conferred on Califor<sub>n</sub>ya, as one of six named states, "jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country. . . ."

By far, the majority of the cases in Public Law 280 states, where state court jurisdiction has been challenged, involve instances where local governments have attempted to enforce their police powers and/or to exercise their authority to tax the real or personal property of Native Americans notwithstanding subdivision (b) of Public Law 280.

Such an effort was addressed in *Bryan*. There, it was held that Itasca County, Minnesota (a Public Law 280 state), could not tax a mobilehome in Indian country owned by a Native American. (*Bryan v. Itasca County, supra,* 426 U.S. 373, 393 [96 S.Ct. 2102, 2112].)

Similarly, we held in *Zachary v. Wilk* (1985) 173 Cal.App.3d 754 [219 Cal.Rptr. 122], that Public Law 280 did not enable enforcement of a municipal rent control ordinance against a non-Indian lessee of property held in trust by the United States for reservation Indians. (173 Cal.App.3d at p. 765.) In other words, the Indian landlords were free to increase the rents charged for Indian Trust Allotment lands without regard to the rent control ordinance of the City of Cathedral City.

Although it was held in *Bryan v. Itasca County, supra,* 426 U.S. 373 that a Minnesota county, notwithstanding Public Law 280, was not thereby empowered to tax the property of Native Americans in Indian country, it was determined in *Becker County Welfare Dept. v. Bellcourt* (Minn.Ct.App. 1990) 453 N.W.2d 543, that a Minnesota county did have the power and the state

---

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country . . . to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

| "State of | Indian country affected |
|---|---|
| "Alaska . . . . . . . . . . . . . . . . | All Indian country within the State |
| "California. . . . . . . . . . . . . . . | All Indian country within the State |
| "Minnesota . . . . . . . . . . . . . . | All Indian country within the State, except the Red Lake Reservation |
| "Nebraska . . . . . . . . . . . . . . | All Indian country within the State |
| "Oregon. . . . . . . . . . . . . . . | All Indian country within the State, except the Warm Springs Reservation |
| "Wisconsin . . . . . . . . . . . . . | All Indian country within the State |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian or any Indian Tribe. . . ." (28 U.S.C. § 1360.)

court the jurisdiction to determine the paternity of a Native American child. Such determination was undertaken after Aid to Families With Dependent Children (AFDC) benefits had been conferred upon the child and the county had sought to identify the father and obtain an order that he pay child support. (*Id.* at p. 543.) After finding his paternity, the trial court awarded judgment against Raymond J. Bellcourt and in favor of Becker County in the amount of $2,214.87 for the expenses of pregnancy and for unpaid child support. Otherwise, Bellcourt was ordered to pay ongoing support of $65 per month. (*Ibid.*)

The sole challenge to the judgment was on jurisdictional grounds. In rationalizing its decision that a Minnesota court had jurisdiction to enter the judgment it did, the *Becker* court said, "[p]ublic law 280 largely eliminated federal restrictions on state jurisdiction. *See* Act of Aug. 15, 1953, c. 505, 67 Stat. 589 (codified as amended at 28 U.S.C.A. § 1360 (West 1976 & Supp. 1989)). It authorizes state court assumption of jurisdiction over civil causes of action in Minnesota to which Indians are parties. Civil laws that are of 'general application to private persons or private property' have full force and effect in Indian country. 28 U.S.C.A. § 1360(a) (Supp. 1989). Civil laws of general application include laws of 'contract, tort, marriage, divorce, insanity, descent, etc.' *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 384 n. 10, 96 S.Ct. 2102, 2108-09 n. 10, 48 L.Ed.2d 710 (1976) (quoting Israel & Smithson, *Indian Taxation, Tribal Sovereignty and Economic Development*, 49 N.D.L. Rev. 267, 296 (1973)). The statute does not, however, confer general civil regulatory control over Indian reservations. *Bryan*, 426 U.S. at 384, 96 S.Ct. at 2108-09 (no power to tax); . . . . [¶] . . . [¶] . . . While chapter 256 of Minnesota Statutes regarding AFDC does contain some regulatory aspects, in a paternity action, the county is only acting on behalf of a private party who has assigned her rights to establish paternity and recover child support. *See* Minn.Stat. §§ 256.74, subd. 5, 257.57, subd. 3 (1988)." (*Becker County Welfare Dept.* v. *Bellcourt, supra*, 453 N.W.2d 543, 544.) Continuing, the court observed that ". . . the legislative history of Pub.L. 280 indicates that the statute was intended to redress the lack of adequate Indian forums. *Bryan*, 426 U.S. at 383, 96 S.Ct. at 2108. Here, the constitution of the Minnesota Chippewa tribe does not presently authorize creation of tribal courts to deal with domestic relations matters. Moreover, contrary to Bellcourt's assertion, neither 42 U.S.C. § 660 nor the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963, gives federal courts jurisdiction over paternity and child support actions such as the present one." (*Ibid.*)

The jurisdiction of California courts in a similar domestic relations matter was extensively explored and discussed in our decision in *County of Inyo* v. *Jeff* (1991) 227 Cal.App.3d 487 [277 Cal.Rptr. 841]. In dealing directly with the issue before it, the *Jeff* court stated, "Nevertheless we believe that the

decision in *Becker County Welfare Dept.* v. *Bellcourt, supra,* 453 N.W.2d 543, which held that the state of Minnesota was enforcing a private right when it sought reimbursement for public assistance in state courts[,] is better reasoned than those of the other states. While Public Law 280 is structured in terms of private parties, we believe that the test is one of substance rather than form. Here Inyo seeks only to collect child support from an individual Indian through assignment. We believe that the mere fact that the state is a party does not in and of itself disqualify Inyo. The action of Inyo can be considered as private in substance. . . . [¶] [Defendant] also criticizes state enforcement of child support on the theory that such action interferes with the 'intimate matters of Indian family relationships . . . .' As authority for this proposition, [defendant] cites the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.). While we recognize that Congress declared in part that it is the policy of the United States to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . .' (§ 1902), we also point out that the act regulates the adoption, foster placement, and termination of parental rights of Indian children (§ 1903). We can find nothing in the act which in any way limits the collection of child support payments by the states. Further we find no state or federal cases which support [defendant's] argument, nor has [defendant] submitted any that do. [*Becker*] *County Welfare Dept.* v. *Bellcourt, supra,* 453 N.W.2d 543, 544, specifically held that the Indian Child Welfare Act of 1978 did not prohibit state collection of child support from reservation Indians. Since Congress has required the states to collect child support vigorously from their noncustodial parents, we believe that it is up to Congress to exempt Indian families if it believes that Indian parents should not be exposed to state collection. The record is bare as to how such collection may interfere with reservation Indian families, extended Indian families, tribal self-government and tribal courts." (*County of Inyo* v. *Jeff, supra,* 227 Cal.App.3d 487, 494-495.)

In *Jeff,* as noted, we held, under the aegis of Public Law 280, that a state court had jurisdiction to order a Native American to reimburse the County of Inyo for AFDC payments it had made for the benefit of his child. If the court had jurisdiction to make such an order, it logically follows that the court would also have jurisdiction to determine paternity in cases arising under 42 United States Code sections 602(a)(26), 654(4), 654(6). (See *Becker County Welfare Dept.* v. *Bellcourt, supra,* 453 N.W.2d 543.) These provisions of federal law require states to establish paternity of children born out of wedlock on whose behalf AFDC payments are being made. In our view, it is inconceivable that Congress could have intended that state courts not have jurisdiction to enforce the foregoing mandates, especially in view of the fact that such mandates arise only after approval of an application made to a county welfare department for AFDC benefits for a Native American child.

The foregoing commentary in *Becker* and *County of Inyo* v. *Jeff, supra,* 227 Cal.App.3d 487 deals only peripherally with cases involving state court jurisdiction to deal with divorce, custody and child support issues. However, the United States Supreme Court in *Bryan* v. *Itasca County, supra,* 426 U.S. 373, as quoted in *Becker,* was of the view that Public Law 280 did confer jurisdiction in Public Law 280 states to apply to Native Americans state "laws of 'contract, tort, marriage, divorce, insanity, descent, etc.'" (*Becker County Welfare Dept.* v. *Bellcourt, supra,* 453 N.W.2d 543, 544.) More conclusive authority recognizing state jurisdiction, when Native Americans seek the services of a state court in a domestic relations case, can be found in *United States* ex rel. *Cobell* v. *Cobell* (9th Cir. 1974) 503 F.2d 790.

*Cobell* was a child custody case which arose in Montana, a non-Public Law 280 state. Both parents were Native Americans and so-called enrolled members of the Blackfeet Tribe. The tribe had a tribal court which dealt regularly with domestic relations matters. The wife instituted a divorce action in a Montana state court, an action in which the husband appeared and counterclaimed. A divorce decree was entered in which the husband was awarded temporary custody of the parties' children. The custody order was later modified to award custody of the children to the wife pending further hearing. Thereupon, the wife removed the children to her home on the Blackfeet Reservation. Meanwhile, the husband had successfully appealed the temporary custody order to the Montana Supreme Court. As a result, the custody order in favor of the wife was vacated and temporary custody was restored to the husband. Notwithstanding the state court order, the wife refused to surrender physical custody of the children. At this point, the Blackfeet Tribal Court intervened at the instance of the maternal grandmother. The tribal court issued an order enjoining removal of the children from the reservation. The husband then applied to the United States District Court for a writ of habeas corpus directing that physical custody of the children be returned to the husband in accordance with the Montana state court order. The United States District Court issued the writ; as a result, the tribal court and the maternal grandmother appealed to the Ninth Circuit, challenging the propriety of the writ. (503 F.2d at pp. 791-792).

The *Cobell* court, in upholding issuance of the writ, concluded with the statement, ". . . the Tribal Court lacked jurisdiction to determine the custody of the Cobell children and . . . the [Tribal Court] order restraining the children was unlawful. The writ of habeas corpus was properly granted." (*United States* ex rel. *Cobell* v. *Cobell, supra,* 503 F.2d 790, 795.) In rationalizing the result it reached, the *Cobell* court observed, "[w]e therefore turn to the primary jurisdictional issue involved in this appeal. The State of Montana's interest in the welfare of the Cobell children is beyond dispute. The children were domiciled in the state and enrolled in the state public

school system when Joan and Henry Cobell began their divorce proceedings. Presence, domicile and jurisdiction over the parents are well recognized bases for the assertion of jurisdiction to determine child custody. Restatement (Second) Conflict of Laws § 79 (1971). Even more pertinent is Mont.Rev.Stat. Tit. 21, § 138 (1947) which states: [¶] 'In an action for divorce the court or judge may, before or after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper, and may at any time vacate or modify the same.' [¶] Thus by *voluntarily* invoking the state court's jurisdiction for divorce purposes, the Cobells clearly submitted the question of their children's custody to the judgment of the Montana state courts. Moreover, Montana, like the majority of states, views its jurisdiction in custody matters as continuing, Barbour v. Barbour, 134 Mont. 317, 330 P.2d 1093 (1958), and unaffected by the removal of the children from the state, Butts v. Collins, 129 Mont. 440, 289 P.2d 949 (1955)." (*Id.* at pp. 794-795, original italics.)

From the foregoing, it can be postulated, when a Native American (even in a non-Public Law 280 state) undertakes to avail himself or herself of the services of a state court in a domestic relations matter, that the state court has jurisdiction to act and to grant whatever relief is contemplated by the action initiated by the Native American. A fortiori, in view of the enactment of Public Law 280 and the characterization thereof by *Bryan* as quoted in *Becker*, the *Cobell* rationale necessarily must obtain in California, one of the six Public Law 280 states.

In light of the foregoing, we note, although wife did not initiate the dissolution proceedings here, that she chose to appear and participate in those proceedings. In particular, she was a party to an extensive marital settlement agreement as to which she joined in seeking trial court approval. Thus, with reference to the broad issue of state court jurisdiction in California, as raised above, there is no question but that the trial court here had the jurisdiction to make the child support order it did.

We turn now to the refining feature of this case which wife argues nullifies the jurisdiction as above described. We have already quoted at length from wife's opening brief in an effort fairly to set forth her position. Summarized, we see it to be, because her only source of income available to pay the child support award would be rental income from the lease of Indian Trust Allotment lands, that the legal effect of the support order was to make a charge upon such income. This is an attempted leap in logic which could be dismissed as quixotic had not wife and her counsel gone to such lengths to conceal this unstated and illogical premise by overwhelming us with a marshaling of authorities which hold variously that such income is immune from civil process. In this, wife and her counsel are of course eminently

correct. (Cf. *Zachary* v. *Wilk*, *supra*, 173 Cal.App.3d 754.) However, such argument begs the question.

By its own terms, the minute order upon which the support order was based explicitly provided that the trial court was "not designating nor ordering [the child support] be paid from any particular source." Otherwise, that order also recited that the court's order constituted "no interference by the Court with any tribal interests [and thus] is not an order against Respondent's Indian Trusts Allocations."

Earlier in the opinion, we were at pains to list the very substantial assets which wife owns quite apart from the lucrative leases of her trust allotment lands, assets which are in no way related to her being a Native American. There is the residence in Jackson Hole, Wyoming, the Porsche, the BMW, the valuable residential lots around Palm Springs and the Rollalong motor home. The trial court was of course aware of these items when it arrived at a figure to award as child support. As a result, it is not accurate to state that the court was forced to regard the rental income from the Indian Trust Allotment lands as the only asset out of which the support order could be enforced. It was not.

To walk through it: If wife does turn obstinate (although her counsel insists she is not) and refuses to pay as ordered, at least two alternatives are open to husband. He could of course cite wife to show cause why she should not be found in contempt. However, an easier remedy would be to move for issuance of writ of execution equal to the amount of any arrearage and then to cause a levy of execution to be made on wife's assets not protected by federal law.

One of such assets could well be wife's personal bank account. Once she has received payment of the rental income from lease of her Indian Trust Allotment lands, it loses its "Indian" character. Money is fungible. When wife bought her Porsche and her BMW, she did not spend "Indian" money. She spent the legal tender which all individuals or persons spend in the United States to acquire goods and property. Wife could, if she chooses to be obstinate, instruct the Bureau of Indian Affairs just to let the payments of her rental income "ride" so to speak. Wife indicated that she had done so in the past, implying that the BIA has some sort of investment program for any allottee's funds which are not drawn down. However, the very act of postponing withdrawal of her funds derived from the rental income would itself demonstrate a concession, once such funds reached her hands, that they would no longer be protected from the legal processes to which all persons' property is amenable.

Continuing with the analysis, suppose some portion of the purchase price were yet owing on the BMW. Suppose wife, for whatever reason, declined to make further payments. The legal owner could then repossess the vehicle and sell it. Suppose the price received did not liquidate the debt; then, suppose the legal owner sued wife for the deficiency. Could she defend such an action, as she has done here, by arguing, because her only source of income is from the lease of Indian Trust Allotment lands, that the trial court had no jurisdiction to enter a deficiency judgment against her? We think not.

This hypothetical illustrates the absurdity of wife's position here. The trial court's support order stands entirely independent of and unrelated to any particular source of funds which may be used to discharge the order. No order to pay money nor a money judgment in our system of jurisprudence implies from whence the money to pay or satisfy it shall come. There are occasional orders which do create charges or liens on particular funds; however, that was expressly disclaimed here. It is for this reason that wife has been unable to cite us to any authority which supports her illogical premise that the order that she pay child support amounted to a charge on income derived from the lease of Indian Trust Allotment lands.

In this regard, we observe that all of the authorities cited by wife involved proscribed efforts by state courts to deal with disputes relating to Indian lands or property in Indian country and/or rights arising therefrom. One such case, alluded to early on in the Discussion, *ante, Boisclair* v. *Superior Court, supra*, 51 Cal.3d 1140, involved a dispute between Indians and non-Indians over whether the non-Indians had an easement over a road on lands claimed to be Indian trust lands. In a special appearance, the Indian defendants moved to dismiss the action against them, asserting that the court lacked subject matter jurisdiction. The trial court denied the motion. The Indian defendants then petitioned the Court of Appeal for a writ of mandate to compel dismissal. Such petition was denied. Upon petition for review to the California Supreme Court, it affirmed in part and reversed in part. The Supreme Court held that the trial court lacked subject matter jurisdiction to grant either declaratory or injunctive relief affecting the Indian defendants' use of the road because the plaintiff in the main action contended that the road was not on Indian trust lands. The Supreme Court went on to point out that title 28 United States Code section 1360(b) precludes state courts from asserting jurisdiction over disputes concerning Indian Trust lands, including disputes in which one party claims the disputed lands are not Indian Trust lands. (51 Cal.3d 1140, summary.)

*Boisclair* v. *Superior Court* bears no resemblance whatsoever to the case before us. We have chosen to discuss it, however, because it is illustrative of the other authorities relied upon by wife, authorities which are all readily

distinguishable from the facts of the case here. Thus, no good purpose would be served in discussing any of the others.

Having said this, because wife sought also to rely on 25 United States Code section 410, which the trial court referred to in its minute order (see *ante*), and which provides that, "[n]o money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period . . . except with the approval and consent of the Secretary of the Interior," we shall discuss it to bring closure to our analysis. Under this statutory prohibition, the trial court clearly could not make wife's child support obligation a charge against wife's rental income from the leases of her Indian Trust Allotment lands. Here, the trial court did not seek to do so; as noted, it disclaimed any intent to do so. The support order is *an in personam obligation* having no relation to or connection with any particular fund or asset which may or could be used to discharge that obligation. In short, wife cannot be heard to say, just because she is a Native American and derives her income solely from leases of Indian Trust Allotment lands, that she is legally excused from supporting her minor children domiciled in California. She is not excused.

At oral argument, counsel emphasized that the issue here (on appeal) was not one of jurisdiction conferred by Public Law 280 but one of preemption per force of 25 United States Code section 410. We have quoted above the text of the provisions of that statute. By its terms, it expressly exempts any money accruing from the lease of lands, held in trust by the United States for any Indian, from liability for any debt or obligation owed by that Indian. Counsel doggedly persisted in his contention that the order of the court was in direct derogation of 25 United States Code section 410 because the rents from the trust allotment lands were wife's only source of income. By means of questions from the court, an effort was made to ascertain from counsel, after the rental income actually had reached wife's hands, just when the immunity provided by 25 United States Code section 410 disappeared. He never answered the question. This colloquy demonstrated the absurdity of wife's position. Certainly, once the rental income was deposited in a bank account outside Indian Country, the money involved lost its identity as immune Indian property. As a result, it was and is clearly available to wife to honor the court's order that she support her children.

With further reference to the oral argument by counsel for plaintiff, we hasten to point out that certain cases he argued to be supportive of his federal preemption theory, to wit: *Estate of Prieto* (1966) 243 Cal.App.2d 79 [52 Cal.Rptr. 80] and *People* ex rel. *Dept. of Transportation* v. *Naegele Outdoor*

*Advertising Co.* (1985) 38 Cal.3d 509 [213 Cal.Rptr. 247, 698 P.2d 150], are wholly inapposite to the issues presented by this appeal. While both decisions ruled against efforts to intrude on the management of Indian lands and exempt property, the facts are so readily distinguishable that no good purpose would be served in discussing them further.

Perhaps our exposition on this point is needlessly prolix. However, by such exposition, we have meant to leave no doubt about the scope of our holding in the disposition of this appeal. Based on the foregoing analysis, we hold that the trial courts of California have jurisdiction to order a Native American to support his or her children domiciled here. In doing so, of course, the trial courts have no power to impinge upon the rights of the parties protected by 25 United States Code section 410. Likewise, such jurisdiction lies to make an award of attorney fees against a Native American in a dissolution proceeding.

DISPOSITION

The order appealed from is affirmed.

Hollenhorst, Acting P. J., and Ward, J., concurred.

A petition for a rehearing was denied February 26, 1997, and the opinion was modified to read as printed above.