KOZINSKI, Circuit Judge,
dissenting:
When we take the judicial oath of office, we swear to “administer justice without respect to persons, and do equal right to the poor and to the rich....” 28 U.S.C. § 453. I understand this to mean that we must not merely be impartial, but must appear to be impartial to a disinterested observer. Today we do not live up to this solemn responsibility. Relying on a ground not raised by either party here or in the district court, we refuse to consider petitioner’s serious and, in my opinion, meritorious claims. This is only the latest indignity inflicted on a criminal defendant who, despite having a seventh-grade education, was forced to defend himself at trial; although having the right to a jury, was never told that he had to ask for one; and who was therefore convicted and sentenced to eight years in prison in a bench trial where neither the prosecution nor the judge lifted a finger to bring the accusing witness into court. He’d have had a fairer shake in a tribunal run by marsupials.
I am troubled by the disparate way we treat the parties. Alvarez and the Community both failed to raise legal issues at the proper time and in the proper manner. Alvarez failed to raise his jury trial and confrontation claims by way of a direct appeal within the tribal court; the Community failed to raise an exhaustion defense in district court. The Community committed an additional default by also failing to raise this issue on appeal—something we’ve repeatedly held is an independently sufficient basis for declining to address it. See, e.g., Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 901 (9th Cir. 2013) (O’Scannlain, J.); Alliance for Property Rights and Fiscal Responsibility v. City of Idaho Falls, 742 F.3d 1100, 1110 n. 7 (9th Cir.2013) (N.R.Smith, J.); United States v. Anekwu, 695 F.3d 967, 985 (9th Cir.2012) (N.R.Smith, J.); Kreisner v. City of San Diego, 1 F.3d 775, 778 n. 2 (9th Cir.1993) (O’Scannlain, J.).
The majority forgives the Community’s double-default but holds Alvarez strictly to his single oversight. I can’t see the justice in this, but it gets worse: Alvarez committed his default when he stood before the Community court without representation. It’s not clear that he was ever advised of a right to take an appeal. But if he was, it happened months before his trial. After he was convicted and sentenced to eight years in prison, he was not reminded of his right to appeal; he was given no notice-of-appeal form or other guidance about how to take an appeal. He was incarcerated with no ready access to legal materials and faced a 5-day filing deadline—shorter than any I’ve ever heard of.
The Community, by contrast, was at all times represented by competent (and presumably well-compensated) counsel. It was fully aware that failure to exhaust was a plausible defense, and raised three separate exhaustion arguments in the district court (though not the one that my colleagues are so taken with). It then chose not to argue exhaustion at all in its appeal to us.
Confronted with this checkered procedural history, we might hold both parties to their defaults. That would have an appearance of fairness. Or, we could forgive both parties their defaults, which also seems fair. But if we do either of these things, the exhaustion issue drops out, and we must rule on the merits of Alvarez’s petition. The only way to reach the majority’s result here is by excusing the Community’s defaults while holding Alvarez *1025 strictly to his—which is just what my colleagues do.
I have read the opinion many times and disagree with pretty much everything in it, including the numerals and punctuation. I explain why in the pages that follow, but first I pose a more basic question: How can a court committed to justice, as our court surely is, reach a result in which the litigant who can afford a lawyer is forgiven its multiple defaults while the poor, uneducated, un-counseled petitioner has his feet held to the fire? I attribute no ill will or improper motive to my excellent colleagues. They are fair, honorable and dedicated jurists who are doing what they earnestly believe is right. But we see the world very differently. See, e.g., United States v. Pineda-Moreno, 617 F.3d 1120, 1123 (9th Cir.2010) (Kozinski, C.J., dissenting from denial of rehearing en banc). I can find no justification for showing such solicitude for the overdog while giving the underdog the back of the hand.
I
Federal courts have a “virtually unflagging obligation ... to exercise the jurisdiction given them.” Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Although we have recognized a limited exception to this rule when habeas petitioners fail to exhaust tribal remedies, “[t]he exhaustion requirement is not an inflexible one,” but rather “is imposed to further the congressional goals of preserving and strengthening native American cultures by insuring that tribal institutions are not denied the opportunity to resolve tribal disputes or to make tribal policy.” St. Marks v. Chippewa-Cree Tribe of Rocky Boy Reservation, Mont., 545 F.2d 1188, 1189 (9th Cir.1976) (per curiam), Accordingly, a respondent may waive a nonexhaustion defense, see Granberry v. Greer, 481 U.S. 129, 133, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), and, even when the defense is preserved, we must exercise caution in relying on it.
A
1. Generally, “a [defense] is forfeited if not raised in a defendant’s answer or in an amendment thereto.” Wood v. Milyard, — U.S. —, 132 S.Ct. 1826, 1832, 182 L.Ed.2d 733 (2012), If the forfeiture is inadvertent, we have discretion to forgive it; but we have no authority to forgive a waiver—a deliberate bypassing of known legal theories. See id at 1833 n. 5 (citing Day v. McDonough, 547 U.S. 198, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006)); see also id at 1832 n. 4, The first question, then, is whether the Community’s failure to raise Alvarez’s nonexhaustion of direct appeals was a mere oversight, or the result of a deliberate choice. The majority concludes it was an oversight, based on the fact that “the Community challenged Alvarez’s nonexhausted petition by filing a motion to dismiss.” Maj. Op. 1018-19.
I draw the opposite inference. The Community’s motion to dismiss was based on Alvarez’s alleged failure to exhaust other tribal remedies, but it omitted any mention of Alvarez’s failure to take a direct appeal. It seems perfectly clear that the Community, counseled by its able lawyers and intimately familiar with the record in its own court, thought about exhaustion and knew it was an available defense. The applicable maxim here is expressio unius est exclusio alterim. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107-11. Turning their backs on six centuries of common law experience, my colleagues invent a new maxim to fit the occasion: expressio unius est inelmio alterim. What good are maxims if judges can stand them on their heads whenever it suits *1026 them? I rather doubt that Bryan Garner or his venerable co-author would approve of my colleagues’ interpretive innovations.
The majority tries hard to squeeze support from Wood, but Wood came out the wrong way for that purpose: The Supreme Court there held that the court of appeals had abused its discretion in doing just what the majority is doing here. The only way Wood helps the majority is that the state there waived an exhaustion defense by expressly telling the district court that it chose not to assert the defense. See Wood, 132 S.Ct. at 1830-31. The majority reads Wood as if an affirmative statement were the only way a tribe could waive the exhaustion defense, but if that were the rule, the Court would have said so. Instead, it announced a far more nuanced rule: “When the State [in our case, the Community] answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available [tribal] remedies.” Granberry, 481 U.S. at 134, 107 S.Ct. 1671. Where the habeas respondent fails to raise exhaustion in its “answer or in an amendment thereto,” the defense is forfeited, Wood, 132 S.Ct. at 1832, subject to a “modest exception,” id,, applicable only in “exceptional cases,” id, at 1832, 1834. Addressing our situation, the Court added: “That restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below, and therefore would not have anticipated in developing their arguments on appeal.” Id. at 1834.
The caution about “exceptional cases” and the need for “additional restraint” would have been pointless if the rule were that a state or tribe can waive the defense only by saying so explicitly. But the Court eschewed such a mechanical rule. Instead, it stuck with the long-standing proposition that, whether a claim or defense has been waived “must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct” of the waiving party. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).
This case, in fact, presents a much closer parallel to Wood than the majority lets on. The state in Wood recognized the possibility of a statute-of-limitations defense when the district court raised the issue sua aponte; nevertheless, it “informed the District Court it would ‘not challenge’ ” the petition on those grounds. Wood, 132 S.Ct. at 1830, 1832. Here, the Community recognized the availability of an exhaustion defense before the district court when it argued that Alvarez “has not raised any of the issues in his Petition in the Community Court in the form of a motion to correct his sentences, a motion for commutation or a habeas corpus petition,” yet never said anything about Alvarez’s failure to file a direct appeal.
In Wood, the state declined to resuscitate the statute-of-limitations defense on appeal, choosing to litigate on the merits. Wood, 132 S.Ct. at 1831. Here, the Community dropped even the exhaustion defenses it did raise below, electing to defend against Alvarez’s appeal on the merits. When the appellate court in Wood again raised timeliness as a possible ground for dismissal and ordered supplemental briefing, the state dedicated more than two-thirds of its briefing to the merits, indicating continued reliance on its merits defense. Here, when asked to address exhaustion at oral argument, the Community again relied on Alvarez’s failure to file a motion for commutation or a habeas petition, but said almost nothing about his failure to take a direct appeal.
*1027 Not only is our case closely analogous to Wood, it’s a far cry from Day, where the Supreme Court found that the lower court did not abuse its discretion by raising a timeliness defense on its own motion. 547 U.S. at 203-04, 126 S.Ct. 1675. Day involved a mistaken concession based on an arithmetic error. The state filed a document stating that the habeas petition was timely, but this was based on a miscalculation of tolled time, an error patent on the face of the filing. The Court described this as “merely an inadvertent error,” and emphasized that “nothing in the record suggested] that the State ‘strategically’ withheld the defense or chose to relinquish it.” Id. at 211, 126 S.Ct. 1675. Day, in short, was about a mistake.
What we have here is no mistake. It is the omission of a legal argument based on facts well known to both parties. The Community didn’t absent-mindedly overlook exhaustion or miscalculate a deadline. Failure to exhaust was part of its defense strategy and, in support thereof, it enumerated three nonexhausted tribal-court remedies. But it never relied on Alvarez’s most obvious omission: his failure to file a direct appeal. Because we must assume that the Community has knowledge of its own remedies and filing deadlines (knowledge the majority ascribes to a man with a seventh-grade education who represented himself), this looks very much like a case where the Community “deliberately steered the District Court away from” the direct appeal issue. Wood, 132 S.Ct. at 1835. If Wood allows waiver by anything short of express disavowal of a defense, as it surely does, then this case is it.
2. Because the Community waived a defense based on Alvarez’s failure to take an appeal, we lack discretion to raise this exhaustion defense sua sponte. But even if the Community’s conduct did not amount to a waiver, we would still lack discretion to consider the defense because Wood’s second prong is unsatisfied.
Wood held that only “where the petitioner is accorded a fair opportunity to present his position, may a ... court consider the defense on its own initiative.” Wood, 132 S.Ct. at 1833-34. Alvarez was not “accorded a fair opportunity to present his position” because he has never been presented with the majority’s homespun theory. As noted, the Community did not raise a defense grounded in Alvarez’s failure to exhaust direct appeals before the district court or in its briefs on appeal. So Alvarez never had a chance to state his position in the customary way—by responding to his opponent’s arguments.
A week before oral argument, we issued an order alerting the parties to “be prepared to address whether this court has jurisdiction over this appeal,” making specific reference to “25 U.S.C. § 1303 as discussed in Jeffredo v. Macarro, 599 F.3d 913, 918 (9th Cir.2010).” Not surprisingly, the discussion at oral argument concerned whether we have jurisdiction. Whether a court has jurisdiction is a question far different from whether it should exercise jurisdiction. Both concepts have “jurisdiction” in their name but they have little else in common. Alvarez therefore had no opportunity to weigh in on issues peculiar to the exercise of jurisdiction, such as whether the Community bypassed its exhaustion argument deliberately or whether the interests of comity and efficiency weigh in favor of abstention.
If my colleagues thought we might dismiss, the appeal on prudential grounds, they said nothing about it. Alvarez’s lawyer had no reason to address an issue no one had raised, nor did the Community raise the point post-argument in any of its numerous 28(j) letters. The first time Alvarez will have heard the majority’s theory will be when he reads the opinion, and the *1028 first chance he will have to address it will be in his petition for rehearing. I don’t think that’s what the Supreme Court had in mind when it told us that a court may “consider the defense on its own initiative” only in cases “where the petitioner is accorded a fair opportunity to present his position.” Wood, 132 S.Ct. at 1834.
An opportunity to respond is especially important because, as the majority acknowledges, whether we should decline to exercise our jurisdiction involves an entirely different inquiry than whether we have jurisdiction at all. The discretionary decision whether to exercise jurisdiction is a complex and nuanced one as to which a skilled advocate such as Alvarez’s current counsel would have a great deal to say. Not only do my colleagues rush to judgment without pausing to hear Alvarez’s view of the material, we have not heard the Community’s position—except, perhaps, that the Community would be happy to win on whatever ground pleases the court. I find it hard to understand how the majority can be confident of its answer to this important question without any input from the parties.
Appellate courts “are particularly ill suited to consider issues forfeited below. Unlike district courts, courts of appeals cannot permit a State to amend its answer to add a defense, nor can they develop the facts that are often necessary to resolve questions of timeliness.” Wood, 132 S.Ct. at 1836 (Thomas, J., concurring in the judgment). If there are additional facts that bear on our exercise of discretion, we’re in no position to consider them. If Alvarez has arguments against the majority’s view that I haven’t thought of, we don’t know what they are. The majority’s opinion in this case provides a cautionary tale about what happens when a court abandons the case the parties briefed and argued, and goes off based on its own pet theory.
3. Even if the Community’s waiver had been inadvertent, and even if Alvarez had a fair opportunity to present his position, that would only permit—not obligate—us to consider an exhaustion argument. Wood makes clear that the discretion to address such unraised arguments “should [be] reserve[d] ... for use in exceptional cases.” Wood, 132 S.Ct. at 1834 (emphasis added). The Community’s failure to raise Alvarez’s nonexhaustion of direct appeal hardly qualifies as exceptional. It is not the result of an obvious and inadvertent error, immediately apparent to everyone once it’s pointed out, as was true in Day. Nor is this a case where the Community would be severely prejudiced by our adjudication of the merits: Had the Community cared about exhaustion, it would at least have kept alive the exhaustion defenses it did raise in district court. Were we to rule on the merits, we’d be doing only what the Community asked us to do in the first place.
These case-specific considerations matter little to the majority, however, because it fashions a sweeping new rule: “[C]ases implicating tribal sovereignty and the tribal exhaustion requirement” are always “exceptional.” Maj. Op. 1020. In our circuit, therefore, tribes will no longer need to raise an exhaustion defense in federal habeas proceedings; we will do it for them. That’s a remarkable inversion of our normal practice, and entirely inconsistent with the principles underlying Wood.
The majority’s conclusion is drawn from a patchwork of inapplicable case-law, improper inferences and acontextual dicta. My colleagues first suggest that a tribe’s blanket immunity from our normal waiver doctrine can be derived from Granberry. But Granberry makes clear that “if a full [proceeding] has been held in the district *1029 court and it is evident that a miscarriage of justice has occurred,” it is normally “appropriate for the court of appeals to hold that the nonexhaustion defense has been waived in order to avoid unnecessary delay in granting relief.” 481 U.S. at 135, 107 S.Ct. 1671. Granbe/rry therefore directs us to at least peek at the merits of a habeas petition in order to determine whether a case is “exceptional,” The majority’s categorical rule—untethered from the merits of the petition or the potential injustice that denial of review may cause— plainly contravenes Granberry ⅛ instruction.
Unable to find support in Granberry ⅛ holding or reasoning, the majority relies on misreading the opinion’s dicta. According to the majority, “the Court [in Gran-berry ] characterized the tribal exhaustion requirement as an ‘inflexible bar to consideration of the merits’ that may not be waived.” Maj Op. 1020. The Granberry Court did no such thing. The “inflexible bar” language that the majority cites comes from the following sentence: “At the other extreme, we might treat nonex-haustion as an inflexible bar to consideration of the merits of the petition by the federal court.” Granberry, 481 U.S. at 131, 107 S.Ct. 1671 (emphasis added). That “extreme” option was precisely what Granberry rejected: “We are not persuaded by either of the extreme positions. The appellate court is not required to dismiss for nonexhaustion notwithstanding the State’s failure to raise it.” Id. at 133, 107 S.Ct. 1671.
True, the “inflexible bar” language is followed by a ef cite to two tribal exhaustion cases. But that’s merely intended to point to an analogous area of law—tribal civil cases—where the exhaustion requirement is stronger than in the habeas context. I don’t understand how Granberry, while creating a rule that limits a court’s power to sua sponte raise an exhaustion argument to only “exceptional cases,” intended—through a ef. cite—to carve out a special exemption from that rule for tribal habeas petitioners. It’s even further afield to then conclude, as the majority does, that this exemption is so powerful that tribal exhaustion arguments are per se unwaiva-ble, irrespective of a petition’s underlying merits—the precise result Granberry explicitly disclaims.
The majority tries hard to bolster its reading of Granberry by referencing civil cases where we have stayed actions pending exhaustion of tribal remedies. See Marceau v. Blackfeet Housing Authority, 540 F.3d 916, 921 (9th Cir.2008) (“[T]he district court should stay, rather than dismiss, the action against the Housing Authority while Plaintiffs exhaust their tribal court remedies”); Allstate Indemnity Corporation v. Stump, 191 F.3d 1071, 1076 (9th Cir.1999), amended 197 F.3d 1031 (9th Cir.1999) (“[T]he district court should stay the action while Allstate exhausts its remedies in tribal court”). But the Supreme Court has made clear that federal review through habeas eorpus-the only remedy explicitly provided for in ICRA-is very different from ordinary civil litigation involving Indian tribes. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 70-71, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).[1] In the civil *1030 context, a stringent exhaustion requirement is needed to limit excessive litigation against tribes, which may “undermine the authority of tribal forums ... [and] impose serious financial burdens on already ‘financially disadvantaged’ tribes.” Id. at 64, 98 S.Ct. 1670. But ICRA’s habeas provision “protect[s] the individual interests [of tribe members] while avoiding unnecessary intrusions on tribal governments.” 436 U.S. at 67, 98 S.Ct. 1670. That’s why, when enacting ICRA, Congress struck “the balance between [its] statutory objectives ... [by] providing only for habeas corpus relief [and not a civil remedy].” Id. at 66, 98 S.Ct. 1670.[2] By mechanically applying the exhaustion doctrine designed for civil litigation to habeas proceedings, the majority disturbs the sensitive balance between group autonomy and individual rights that Congress sought to preserve. And it goes without saying that the harm caused by staying a civil case pending resolution of a tribal proceeding is negligible compared to that caused by dismissing a prisoner’s ha-beas petition when he has no alternative recourse.
Unsurprisingly, the majority can’t find a single case in any circuit holding that a court may deny habeas relief solely on the basis of an exhaustion argument it raised sua sponte. Every case the majority cites in support of this novel proposition is a civil one. Maj. Op. 1020-22. We cannot blithely import rules from the civil context to habeas, where vital liberty interests are at stake. That’s doubly true in Indian law, where ICRA’s habeas provision has been singled out—both by Congress and the Supreme Court—as the sole bulwark against potential “injustices perpetrated by tribal governments.” Martinez, 436 U.S. 49 at 66, 98 S.Ct. 1670 (internal quotation marks omitted). The line of non-habeas cases the majority relies on, therefore, is no foundation for a blanket exemption for tribes from our ordinary rules of waiver in the habeas context.
In a final hail mary attempt at justifying why tribal exhaustion cases are per se “exceptional,” the majority invokes “our general duty to avoid deciding unnecessary issues.” Maj. Op. 1023 (quoting Turner v. U.S. Parole Comm’n, 810 F.2d 612, 613 n. *1031 3 (7th Cir.1987)). But what could possibly be “unnecessary” about deciding whether Alvarez’s fundamental rights have been violated? The majority stresses that Alvarez’s confrontation clause and right to jury claims present difficult and unresolved issues of federal law. Are we really to leave a man imprisoned with no remedy because we fear we’re not up to the task of resolving hard legal questions? Avoidance canons do not permit us to avoid our basic duties as a court of law.
Moreover, while the majority privileges considerations of comity over Alvarez’s rights at every turn, any comity interests implicated here are less than compelling because the Community’s process seems to be designed to deny convicted defendants a fair chance to appeal. The Community provides only five days in which to appeal a conviction, even though many litigants, like Alvarez, lack counsel. According to Alvarez, and undisputed by the Community, the facility in which he was incarcerated had no law library, so he didn’t have even the theoretical possibility of researching the law and identifying any errors in his trial or figuring out when and how to appeal them. After the trial concluded and Alvarez was sentenced, the judge did not remind him of his right to appeal or tell him when and how to exercise it.
The only time Alvarez might have been informed of the five-day deadline for filing his appeal was at his arraignment, nearly five months prior to his sentencing, and there’s no evidence that Alvarez was given this information even then. After the Community court sentenced him, he was not given a notice-of-appeal form, provided written instructions, or told how or where to file. The Community seems to have done everything in its power to prevent Alvarez from appealing his conviction. This may, in fact, be why the Community has chosen (wisely, in my view) not to rely on failure to appeal in making its exhaustion argument.
“[I]t would be nothing less than abdication of our constitutional duty and function to rebuff petitioners with this mechanical [exhaustion] formula whenever it may become clear that the alleged state remedy is nothing but a procedural morass offering no substantial hope of relief.” Marino v. Ragen, 332 U.S. 561, 564, 68 S.Ct. 240, 92 L.Ed. 170 (1947) (Rutledge, J., concurring). Such is the case here; Alvarez— and our system of justice—deserve better. Because these allegations, if borne out, would demonstrate a grave miscarriage of justice, we should not raise failure to exhaust sua sponte.
B
Even if the Community had preserved its nonexhaustion defense, it is unavailing. We have observed that in evaluating such a defense, “we must first ascertain whether any meaningful tribal remedies exist, and, if so, whether exhaustion will in any way serve the purposes for which it is intended.” St. Marks, 545 F.2d at 1189.
As we said nearly forty years ago: “That remedies are available in theory, but not in fact, is not synonymous with failure to exhaust remedies. That ineffective and meaningless procedures were available to petitioner does not preclude his seeking a writ of habeas corpus.” United States ex rel. Cobell v. Cobell, 503 F.2d 790, 794 (9th Cir.1974). The order issued by the tribal court in Cobell “contained no invitation to participate in tribal appellate processes,” id. at 793-94, and neither did Alvarez’s judgment of conviction. In neither our case nor Cobell did the trial judge explain to the losing party that he could challenge the judgment by way of an appeal.
Contrary to the majority’s suggestion, Selam v. Warm Springs Tribal Corr. Fa *1032 cility, 134 F.3d 948 (9th Cir.1998), underscores why we must reach the merits here. Selam was represented by a lay Tribal Spokesperson who mounted a diligent defense notwithstanding Selam’s unwillingness to assist. See id, at 950. When Selam lost at trial, “the tribal court judge informed Selam that he could appeal his convictions to the tribal court of appeals.” Nothing of the sort happened here. What’s more, Selam did appeal, and raised six grounds of error, “indicating that he did not consider his appeal futile.” Id. Selam was in much the same position as the Community here with respect to exhaustion: He made a deliberate choice to raise some claims but not others. Consequently, we declined to excuse his failure to exhaust additional claims presented for the first time in his habeas petition. Why are we treating the Community here better than we did Selam?
The majority effectively holds that a defendant’s right to federal habeas review under ICRA is always and entirely super-venient on his compliance with tribal procedure, no matter how fundamentally unfair that procedure may be. Cf. Lee v. Kemna, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) (state prisoners are entitled to federal habeas review when their procedural default is the result of inadequate state procedures); Hoffman v. Arave, 236 F.3d 523, 531 (9th Cir.2001) (federal habeas review is not precluded unless “the defendant has had a reasonable opportunity to have the issue as to the claimed [federal] right heard and determined by the State court”) (internal quotation marks omitted). And, unlike state prisoners, those convicted by a tribal court who miss their appeal deadline will be permanently barred from federal court even if there is both “cause” and “prejudice” for their failure to exhaust, and even if such a result is a “fundamental miscarriage of justice.” Cf. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (claims not presented to a state court will not be defaulted if “the prisoner can demonstrate cause for the default and actual prejudice ... or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.”); Franklin v. Johnson, 290 F.3d 1223, 1231 (9th Cir.2002) (“If a petitioner failed to present his claims in state court and can no longer raise them through any state procedure, state remedies are no longer available, and are thus exhausted”). It’s particularly inequitable to treat tribal prisoners so much worse than their state counterparts in light of the fact that there is no right to counsel in tribal courts. Under the majority’s rule, uncounseled tribal defendants subject to flagrantly unlawful convictions and fundamentally unfair procedural bars can nonetheless be prevented from obtaining federal habeas review. No other category of person subject to criminal jurisdiction in the United States gets anything close to such shabby treatment.
Moreover, the majority’s holding permits a tribe to effectively nullify section 1303 of ICRA through artful manipulation of its courts’ appellate procedures. A tribe could, for example, create a five-minute time-limit to appeal a tribal court’s decision and, under the majority’s newly minted rule, a prisoner’s failure to comply would constitute a permanent bar to federal habeas relief. By establishing mandatory dismissal of unexhausted claims, the majority implicitly blesses the legitimacy of even such absurdly truncated time requirements.[3]
*1033 The majority reserves the possibility that ICRA’s due process clause might offer a defendant some protection in “an extreme case.” Maj. Op. 1018 n. 7. But how is this not an extreme case? Alvarez’s situation is arguably worse than a defendant subject to a five-minute appeal window—his compliance with tribal procedure was practically impossible, given not only the short deadline, but his absence of counsel, lack of notice and inability to access even rudimentary legal materials. If ICRA’s due process provision doesn’t apply to Alvarez, I fail to see how it will apply to anyone. By denying federal ha-beas review in even the extreme circumstances present here, the majority renders ICRA’s due process protections chimerical, and places tribe members’ capacity to vindicate their federal rights entirely at the whim of their tribes. That’s hardly faithful to the delicate balance between individual and group rights Congress sought to maintain when enacting ICRA.
Finally, even if a direct appeal within the Community court system were a meaningful remedy, we should still decline to enforce the exhaustion requirement because any marginal benefit it provides in terms of “presenting] and strengthening] tribal institutions,” St. Marks, 545 F.2d at 1189, is far outweighed by the need to adjudicate the serious deprivations of rights that Alvarez alleges. See pages 1028-29 supra. As we have repeatedly held, “[t]he exhaustion requirement is not an inflexible one.” St. Marks, 545 F.2d at 1189; see also Cobell, 503 F.2d at 793; Selam, 134 F.3d at 953. If the majority had any discretion to exercise, it abuses it by refusing to exercise it in Alvarez’s favor.
II
Alvarez claims that he was denied his jury trial and confrontation rights. See 25 U.S.C. § 1302(a)(6), (10). Although the majority sees no need to give his allegations anything more than passing mention, a closer look at Alvarez’s trial and conviction reveals the serious wrong he has suffered, and the high price he has paid as a result.
A
1. ICRA provides that “[n]o Indian tribe in exercising powers of self-government shall deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.” 25 U.S.C, § 1302(a)(10) (emphasis added). As with the Community’s nonexhaustion defense, this jury trial right may be waived by “an intentional relinquishment or abandonment of a known right or privilege.” Johnson, 304 U.S. at 464, 58 S.Ct. 1019 (emphasis added). Whether this standard is met “depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.” Id.
According to the Community, it was obligated to provide Alvarez only with a right to a jury trial as defined by ICRA, and ICRA provides for a jury only “upon request.” The Community therefore argues that its obligation to provide a jury wasn’t triggered until Alvarez made such a re *1034 quest. But the Community fails to explain how Alvarez would have known that he was required to make a request. Its theory seems to be that Alvarez must be presumed to know the law, including every jot and tittle in ICRA, But if we presume that kind of knowledge, what’s the point of informing criminal defendants of any rights? The presumption in criminal cases is precisely the reverse: Defendants don’t know their rights and so we must tell them.
Alvarez was never told he had to ask for a jury. The Community produced the affidavit of Carleton J. Giff, who prosecuted Alvarez in the Community court. Giff states that a “ ‘Defendant’s Rights’ form was routinely stapled to each criminal complaint provided to the defendant prior to arraignment,” and notes that “the rights would have been routinely read at the beginning of each arraignment docket.” This speaks only to the Community’s general practice, not to what happened in Alvarez’s case. Giff does not produce a copy of Alvarez’s Complaint with a rights form attached, nor does he claim he remembers that Alvarez was apprised of his rights. And the Defendant’s Rights form Giff attaches to his affidavit says only “[y]ou have the right to a jury trial.” It does not tell defendants that they must ask for a jury, or when and how they must do so.
A transcript of Alvarez’s arraignment has the judge saying that Alvarez had been informed of his legal rights, and asking if Alvarez had any questions about them, to which Alvarez answered that he did not. But there is no reference to which rights he was informed of and in what terms. How would a man with a seventh-grade education have known whether he was advised of all of Ms rights, or whether they were stated fully and accurately? And why wasn’t Alvarez advised of his rights on the record by a judge rather than off the record by an unidentified nobody?
We advise defendants of their rights because we presume they don’t know them. Judges perform the advisement to impress defendants with their importance. And we do it on the record so we can later confirm that nothing was omitted or misstated. Are tribal courts so disdainful of defendants’ rights that such formalities are routinely omitted? This, after all, was not traffic court; Alvarez got eight years behind bars.
The most we can infer on this record is that someone may have read Alvarez some rights, not whether they were all read or whether they were accurately stated. And the judge himself only explicitly mentioned one right: “Mr. Alvarez, sir, you may be eligible for counsel through Four Rivers Indian Legal Services. If you are not eligible, you will be responsible for obtaining counsel on your own. And this will then be at a cost to you.” Counsel for the Community conceded at oral argument before us that we have no evidence that Alvarez was actually advised of any other rights.
Clearly, the means of invoking a right— and even the fact that a right must be specifically invoked—is critical information for a defendant planning his defense. There is no legitimate reason for the Community’s systematic failure to advise defendants that they must request a jury if they want one. By failing to address the issue in this case, we are allowing the Community and perhaps other tribal jurisdictions to continue to deprive countless defendants of their right to trial by jury.
2. When the Supreme Court first held that the Sixth Amendment jury trial right was waivable, it was careful to defend its decision against those who feared that uninformed and unsophisticated defendants *1035 may waive their right to a jury against their best interests. Acknowledging that the right at common law was not waivable, the Court pointed out that the modern rule is a product of changes in the broader criminal justice regime: “Such a course raised up a sort of a barrier which the court could utilize when a prosecution was successful which ought not to have been successful, or when a man without money, without counsel, without ability to summon witnesses, and not permitted to tell his own story, had been unjustly convicted, but yet under the ordinary principles of waiver, as applied to civil matters, had waived every defect in the proceedings.” Patton v. United States, 281 U.S. 276, 307-08, 50 S.Ct. 253, 74 L.Ed. 854 (1930). It was plausible to permit waiver under the modern regime, however, due to the emergence of other procedural protections: “The man now charged with crime is furnished the most complete opportunity for making his defense. He may testify in his own behalf; if he be poor, he may have counsel furnished him by the state, and may have his witnesses summoned and paid for by the state.” Id. at 308, 50 S.Ct. 253. But no such protections were afforded Alvarez; the Community court seems to be much closer to the rough and tumble justice of the common law courts.
While ICRA spells out what rights are to be accorded criminal defendants in tribal courts, it doesn’t specify how those rights are to be invoked or waived. Congress left that to judicial interpretation. In performing that function we must take into account the practical realities of the tribal-court proceedings, including the fact that many defendants are forced to represent themselves. Although some of the rights provided by ICRA are more deferential to tribes than the Bill of Rights, the Act nevertheless seeks to “ ‘protect individual Indians from arbitrary and unjust actions of tribal governments,’ ” in light of the fact that “the most serious abuses of tribal power had occurred in the administration of criminal justice.” Martinez, 436 U.S. at 61, 71, 98 S.Ct. 1670 (quoting S.Rep. No. 841, 90th Cong., 1st Sess., 5-6 (1967)).
It is hardly an intrusion on the sovereignty and integrity of tribes to require that they inform defendants of the full nature of their rights, including when and how they must invoke them. Insisting that tribes do so advances tribal sovereignty by ensuring that these issues are fully and fairly litigated within the tribal system rather than having them show up on our doorstep after a defendant has fully served his sentence. Happily, this is a case where both legislative interests—respecting tribal sovereignty and protecting the procedural rights of defendants—point to the same answer.
The denial of the right to a jury trial is a structural error requiring automatic reversal of a conviction. Sullivan v. Louisiana, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Moreover, the Community has never alleged that the denial of a jury in Alvarez’s case was harmless, despite raising such a defense with respect to his confrontation claim. Cf. O’Neal v. McAninch, 513 U.S. 432, 444, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Accordingly, we must vacate Alvarez’s conviction.
B.
Alvarez also claims that the Community court violated his right to confrontation when it admitted the complaining witness’s statements through the testimony of Officer Benally. ICRA provides that “[n]o Indian tribe in exercising powers of self-government shall deny to any person in a criminal proceeding the right ... to be confronted with the witnesses against him.” 25 U.S.C. § 1302(a)(6). Because *1036 this mirrors the Sixth Amendment guarantee that “the accused shall enjoy the right ... to be confronted with the witnesses against him,” we may apply caselaw interpreting the federal constitutional right to its IGRA analogue. Randall v. Yakima Nation Tribal Court, 841 F.2d 897, 900 (9th Cir.1988) (“Where the rights are the same under either [the federal or tribal] legal system, federal constitutional standards are employed in determining whether the challenged procedure violates [IGRA].”).
Alvarez’s trial occurred before the Supreme Court decided Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), so his confrontation claim must be evaluated under Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In that ease, the Court held that out-of-court statements could be introduced at trial only if the declarant is unavailable and the statements bear adequate indicia of reliability. Id. at 66, 100 S.Ct. 2531.
The district court did not assess whether the Community court violated Alvarez’s confrontation right, instead relying on its conclusion that any error that may have occurred was harmless because Alvarez confirmed the truth of the out-of-court statements. This logic is dubious: Alvarez only affirmed that “everything that [Officer Benally] says it be true,” following and in response to the alleged confrontation violation. And as the prosecutor stated at trial, “the statements on the record of the defendant ... are not evidence,” and the “only things that could be considered by the Court is what is testified to.”
Roberts observed that “[a] witness is not ‘unavailable’ for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial,” and that “[t]he lengths to which the prosecution must go to produce a witness ... is a question of reasonableness.” Id. at 74, 100 S.Ct. 2531 (citations omitted). In this case, the lengths to which the prosecution went to produce the victim consisted of issuing a subpoena, which was “left at the party(ies) usual place of abode with a person of suitable age and discretion who resides at the party(ies) usual place of abode.” The Community argues that this is sufficient to show unavailability because it is all that the Community’s own laws required it to do, but this is untenable under Roberts, which speaks in terms of “good-faith effort” and “reasonableness.” If dropping off a subpoena at a witness’s home were enough, the good-faith effort and reasonableness requirements would be meaningless.
Officer Benally testified that when a prosecution witness fails to appear, “[s]ometimes they’ll do a continuance or warrant or whatever they see is appropriate, depending on the circumstance,” including, in some cases, prosecuting witnesses for failing to respond to a subpoena. The record reflects no such efforts in Alvarez’s case. Neither the prosecution nor the court went to any trouble to bring the witness into court. The trial was not continued when the victim of the alleged crime failed to appear. No bench warrant was issued; no constable was sent to bring her into court. Confronted with an uneducated defendant who had no one trained in the law to speak for him, the court and the prosecutor took the easy way out by conducting a trial based on hearsay.
The fact that the Community court let the prosecution get away with such tactics doesn’t mean that they were reasonable, much less that they represented a good-faith effort to produce the witness. See Wilson v. Bowie, 408 F.2d 1105, 1106-07 (9th Cir.1969) (finding that a witness was *1037 not unavailable when “the only explanation given by the State ... for [the witness’s] absence was the prosecution’s statement that it had attempted to subpoena [him],” and “there was no showing that [the witness] could not appear in court on another day”). Indeed, knowing Alvarez’s lack of sophistication and the potential value of having his victim testify, the prosecution had an even greater duty to ensure that she was present at Alvarez’s trial. The Community court certainly did.
Although it’s perfectly clear that the Community violated Alvarez’s confrontation right by admitting the hearsay testimony of Officer Renally, a separate question remains as to whether the victim’s statements introduced through her brother, which were largely duplicative of Officer Benalljfs testimony, fell within a hearsay exception, potentially mooting the confrontation issue. See White v. Illinois, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (holding that unavailability need not be shown under Roberts when the hearsay statement falls within a hearsay exception providing sufficient ini-dicia of reliability). Because we must reverse on jury trial grounds, this issue needn’t detain us. Were this case to be retried by the Community, however, and should the victim once again fail to appear, the tribal court would have to consider whether the testimony could nevertheless be introduced under the standards of Crawford,

III

The majority errs in dismissing this case sua sponte based on Alvarez’s failure to exhaust his direct appeals in the Community court. Proceeding to the merits of Alvarez’s petition, I would find that the Community violated Alvarez’s right to a jury trial under ICRA by failing to inform him that he needed to request a jury. This was a structural error fatally undermining the conviction. Accordingly, I dissent.

. Understanding the origins of our tribal exhaustion jurisprudence in civil cases helps explain why mechanically applying it to the habeas context is so wrong. Before the Supreme Court’s 1978 decision in Martinez, several lower courts had implied a private right of action in federal court to enforce ICEA's "bill of rights’ ’—Section 1302. See, e.g., Johnson v. Lower Elwha Tribal Cmty. of Lower Elwha Indian Reservation, 484 F.2d 200, 201 (9th Cir.1973). In Martinez, the Supreme Court held that IGRA does not provide such an implied cause of action. 436 U.S. 49 at 72, 98 S.Ct. 1670, 56 L.Ed.2d 106. But plain *1030 tiffs soon found another way to bring civil claims against tribes: “Rather than attacking [a] tribal action directly as violative of a specific provision of [ICRA], litigants began filing federal complaints alleging an absence of tribal power to engage in the challenged activity, thereby recasting the dispute as jurisdictional in nature.” Laurie Reynolds, Exhaustion of Tribal Remedies: Extolling Tribal Sovereignty While Expanding Federal. Jurisdiction, 73 N.C. L.Rev. 1089, 1100-01 (1995). The abstention doctrine articulated in Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians was a response to the specific context of post-Martinez civil litigation. See 471 U.S. 845, 849 n. 3, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). In National Farmers, "the Supreme Court agreed that these jurisdictional challenges did indeed arise under federal law for the purpose of establishing federal question jurisdiction, but instructed the lower courts to stay their hand until the litigants had exhausted their tribal remedies." Reynolds, 73 N.C. L.Rev. at 1101. There can be little doubt, therefore, that the strong abstention doctrine articulated in National Farmers relates only to that category of litigation affected by Martinez. Since Martinez explicitly left habeas claims untouched, it is wrong to infer that the National Farmers abstention doctrine is applicable to habeas,

. According to the majority, Martinez supports the conclusion that “even when evaluating a habeas petition, we must be mindful of our obligation to avoid ‘intrad[ing] needlessly on tribal self-government.’ ” Maj. Op. 1021 (quoting Martinez, 436 U.S. at 71, 98 S.Ct. 1670). The actual context of that quote is as follows: "[Gjiven Congress' desire not to intrude needlessly on tribal self-government, it is not surprising that Congress chose at this stage to provide for federal review only in habeas corpus proceedings.” Martinez, 436 U.S. at 71, 98 S.Ct. 1670.

. The majority maintains that failure to exhaust can be excused when "exhaustion would have been futile or [ ] the tribal court of appeals offered no adequate remedy.” *1033 Maj. Op. 1016. But since the majority holds that futility and/or lack of remedy must be present at the time the tribal appeal could have been filed—rather than the time at which the federal petition is filed—these exceptions are practically worthless. Even a five minute (or thirty-second) appellate window still technically offers an “adequate remedy” which is not “futile." The issue is not whether a tribal remedy theoretically exists, but whether a prisoner can meaningfully avail himself of that remedy. ,